PEOPLE v TOMA

Docket No. 112860. Argued November 9, 1999 (Calendar No. 8). Decided
    June 28, 2000.

    Adil Toma was convicted by a jury in the Oakland Circuit Court,
    Barry L. Howard, J., of first-degree murder and possession of a fire-
    arm during the commission of a felony. Following a *Ginther* hear-
    ing, the trial court reversed the defendant's convictions and granted
    his motion for a new trial, finding that he had received ineffective
    assistance of counsel. It concluded that defense counsel's failure to
    clarify the defendant's testimony prevented the jury from under-
    standing the defendant's version of the events and accurately
    adjudging his credibility. The Court of Appeals, NEFF, P.J., and
    O'CONNELL and YOUNG, JJ., affirmed in an unpublished opinion per
    curiam, finding that defense counsel's failure to clarify the defend-
    ant's testimony could not be considered a matter of trial strategy
    because the testimony provided the only direct rebuttal of the pros-
    ecution's case, and that the errors of trial counsel were so grave as
    to render the proceeding fundamentally unfair. The Court also
    found that the trial court's admission of a forensic psychologist's
    testimony over defense counsel's objection that the communication
    was privileged was error requiring reversal under MCL 768.20a(5);
    MSA 28.1043(1)(5) and *People v Jacobs*, 138 Mich App 273 (1984)
    (Docket No. 203029). The people appeal.

    In an opinion by Justice MARKMAN, joined by Chief Justice
    WEAVER, and Justices TAYLOR and CORRIGAN, the Supreme Court *held*:

    Any error stemming from the admission of the testimony regard-
    ing statements by the defendant to a forensic psychologist in com-
    pliance with MCL 768.20a; MSA 28.1043(1) was harmless. The
    defendant was not denied his right to the effective assistance of
    counsel on the basis of his counsel's failure to ensure that his testi-
    mony of what occurred was presented to the jury in a different
    manner. Defense counsel's performance was neither deficient nor
    prejudicial in this regard.

    1. MCL 768.20a(5); MSA 28.1043(1)(5) provides that statements
    made by a defendant to personnel of the center for forensic psychi-
    atry, to other qualified personnel, or to any independent examiner
    during an examination is not admissible at trial and has no proba-

tive value on any issue other than the defendant's mental illness or insanity at the time of the alleged offense. No exception to this rule existed at the time of trial for impeachment. The trial court's decision was nothing more than an erroneous evidentiary ruling and, thus, is preserved nonconstitutional error, not requiring reversal unless, in the context of the untainted evidence, it affirmatively appears that the error asserted undermines the reliability of the verdict. Given the damage that the defendant's own testimony did to his credibility, and the enormity of the untainted evidence, any error stemming from the jury learning that the defendant had, at some point, denied being at the scene of the crime to a psychologist was harmless. The defendant has not established that it is more probable than not that a different outcome would have resulted without the error.

2. A defendant who wishes to establish denial of the state or federal constitutional right to the effective assistance of counsel must show that counsel's representation fell below an objective standard of reasonableness and that this was so prejudicial as to deny him a fair trial. The defendant must overcome the strong presumption that counsel's action constituted sound trial strategy under the circumstances, and must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. In this case, counsel's failure to elicit elaborative testimony from the defendant was neither deficient nor prejudicial. The defendant did not demonstrate that his trial counsel's performance fell below an objective standard of reasonableness and that this was so prejudicial that he was denied a fair trial. Rather, his trial was fundamentally fair and the verdict is reliable.

Reversed and remanded.

Justice KELLY, joined by Justice CAVANAGH, dissenting, stated that the defendant is entitled to a reversal of his convictions, because he was deprived of effective assistance of counsel. The majority erred in finding that the trial court's admission of the forensic examiner's testimony to impeach the defendant was not constitutional error. Furthermore, the trial court's error was not harmless beyond a reasonable doubt. To allow the defendant's convictions to stand makes a mockery of the law's concern for a fair trial and damages public respect for the judicial process.

To establish ineffective assistance of counsel, a defendant must show that the attorney's representation fell below an objective standard of reasonableness compared to professional norms and so prejudiced him that he was deprived of a fair trial. To demonstrate the requisite prejudice, the defendant must prove that, but for errors of counsel, there was a reasonable probability of a different

outcome. In this case, counsel's role in the presentation of his client's testimony failed to meet the objective requirements for reasonable assistance of counsel when compared to professional norms, and the facts support a finding that counsel's errors were outcome determinative. This is not a case in which the evidence against the defendant was overwhelming. Instead, it is one in which there was a complete failure of the adversarial process, rendering it inevitable that the prosecutor's proofs would seem overwhelmingly persuasive.

A defendant wishing to establish insanity at the time of an offense must notify the court and the prosecuting attorney of that intention thirty or more days before trial. The notice serves to forewarn the prosecutor; it also triggers the defendant's required examination by personnel at a center for forensic psychiatry or by other qualified personnel. Failure to submit to the forensic examination and to fully cooperate in it bars a defendant from presenting an insanity defense. Such preclusion does not violate a defendant's state and federal constitutional rights to present a defense. The truth-seeking function of trial courts would be substantially impaired were a defendant, raising an insanity defense, permitted to assert the psychologist-patient privilege and preclude an examiner's testimony. By raising an insanity defense, the defendant has placed his mental state at issue and waived the privilege in that regard.

The integrity of evidence of insanity is likewise threatened if the examining forensic psychologist is permitted to testify about matters other than the issue of a defendant's insanity. Where a court allows an examiner to impeach on an issue other than a defendant's mental state, it violates the defendant's constitutional right to due process of law. In this case, the error in admitting the testimony of the forensic psychologist was preserved, nonstructural constitutional error. The prosecution bears the burden of showing that the admission of the forensic examiner's testimony was harmless beyond a reasonable doubt.

Justice YOUNG took no part in the decision of this case.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *David Gorcyca*, Prosecuting Attorney, *Daniel Lemisch*, Chief, Appellate Division, and *Marilyn J. Day*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Susan J. Smith*) for the defendant-appellee.

Amicus Curiae:

*Elwood Brown*, President, *John D. O'Hair*, Prosecuting Attorney, and *Timothy A. Baughman*, Chief, Research, Training and Appeals, for Prosecuting Attorneys Association of Michigan.

MARKMAN, J. Following a jury trial, defendant was convicted of first-degree felony murder, MCL 750.316(1)(b); MSA 28.548(1)(b), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; MSA 28.424(2).[1] The Court of Appeals affirmed the trial court's reversal of defendant's convictions, agreeing that defendant had been denied the effective assistance of counsel. The Court of Appeals also found that the admission of testimony regarding statements made by defendant to a forensic psychologist in contemplation of interposing an insanity defense was error requiring reversal. We hold that any error stemming from the introduction of defendant's statements to the forensic psychologist was harmless and that defendant was not denied his constitutional right to the effective assistance of

---

[1] The jury convicted defendant on six counts: (I) second-degree murder, MCL 750.317; MSA 28.549, as a lesser included offense to a charge of first-degree, premeditated murder, MCL 750.316(1)(a); MSA 28.548(1)(a); (II) felony-firearm based on count I; (III) felony-murder based on arson or attempted arson; (IV) felony-firearm based on count IV; (V) felony-murder based on breaking and entering a dwelling with the intent to commit arson; and (VI) felony-firearm based on count V. The jury hung on two counts of assault with intent to commit murder, MCL 750.83; MSA 28.278, as well as two counts of felony-firearm based on those assault charges. At sentencing, the prosecutor elected to maintain the convictions on counts V and VI, and the trial court vacated the others.

counsel. Consequently, we reverse the judgment of the Court of Appeals.

I

Defendant's convictions arose from events that occurred sometime around 10:30 P.M. on the night of November 29, 1993, when Steve Burge was shot in the face and doused with gasoline at the front door of a residence he shared with Margo DeVita (now known as Margo McPherson) and her two children. Margo[2] testified that she had temporarily cohabited with defendant on two prior occasions under circumstances that she described as platonic. However, during the second of these periods, which lasted about a month, defendant began making unwelcome sexual overtures, and personal items went missing from Margo's bedroom. After an incident when defendant tried to imprison Margo in his house, she moved in with her mother until she was able to lease a unit in a duplex house. Steve, Margo's boyfriend, later moved in with her. In the months before the killing, Margo observed defendant drive past this house on numerous occasions, and, once, defendant stopped in and offered to pay Margo's rent if Steve would move out.

Margo testified that on the night of November 29, 1993, someone kicked the front door open while she was half-asleep on the couch and Steve was watching football on television. Margo ran to her children in another room, and later came out to find Steve stum-

---

[2] Uncharacteristically, our recitation of the facts employs the first names of witnesses who were at or near the location of the shooting. This is necessary because the various parties' first names are relevant to one of defendant's claims.

bling back through the front door, dripping with gasoline and bleeding profusely from a gunshot wound to the cheek. Through the window, Margo saw a man of defendant's build, wearing a mask and light colored surgical gloves, struggle with her neighbor, Danny Parenteau, and then run away. After Steve was transported to the hospital, Margo observed an unfamiliar hat with hair attached to it in her living room, a gas can in front of her house, and a mask near the gas can. She reported to the police her suspicions that defendant was the assailant.

Danny Parenteau testified that on the night in question, he was watching football on television when he heard a gunshot from the house across the street. Danny ran outside and observed Steve and another man struggling inside the front door of Steve's house. Steve forced the other man out of the house, and, when Danny approached to assist, he noted that Steve was covered with blood. As Steve collapsed, he shoved the other man away. Danny realized that this other man, who had also fallen to the ground, was armed with a gun, so Danny seized this man's wrist and called to his brother, Russell, for help. The man smelled of gasoline, was wearing white, see-through gloves, and fired off several shots that Danny was able to direct away from himself. Russell came to help, but took cover behind a tree when the assailant shot toward him. As this was occurring, Danny observed Steve get back up, while holding his throat, and make it through his front door before again collapsing.

Danny tried to drag or carry the armed man, but when Danny stumbled and lost his grip, he ran for cover for fear of being shot. The man was not wear-

ing a mask at this point and he ran to a car, which Danny recognized as one that he had observed cruise past Margo's house on four or five occasions. Danny was able to identify defendant at a police lineup as the man with whom he had struggled. Russell Parenteau, who lived with Danny, corroborated his brother's account and added that the assailant ran to a car that was parked next to the home of another neighbor, John Talarico.

John Talarico testified that he lived next door to Steve and Margo and that, on the night in question, he heard gunshots just after he got out of the shower, so he looked out his window and saw a gunman wrestle with Danny and shoot toward Russell. From a distance of fifty feet, John observed the gunman's face and identified him as defendant. Defendant departed in a car that John recognized as one that he had observed cruise slowly by on several occasions, once with its lights out.

Donald Lumm, a neighbor who lived around the corner from Margo and Steve, testified that on the night of November 29, 1993, he was in his kitchen when he heard several shots. Donald then heard squealing tires and, through his kitchen window, saw a vehicle "take off really quick." Donald identified a photograph of defendant's car as the one he saw that night.

Steve died from what was determined to be a single gunshot wound to the right side of his jaw, with the bullet traveling down through his neck. From the scene, the police recovered: a white towel soaked in gasoline, a hat with a wig sewn to it, several .38 caliber bullet casings, a mask found between the sidewalk and curb, and a fingertip from a "rubber" glove.

The front screen door was broken outward and covered with blood, but there was no visible damage to the interior door. There was also blood outside the house, around the door area and on the grass. A subsequent search of defendant's house turned up a large quantity of the type of gloves used by meat packers.[3] Hairs were retrieved from the mask and hat, which were later determined to be similar in all respects to a sample of defendant's hair. Fingerprints recovered from tape attached to the mask were later determined to be those of defendant.

The police began staking out defendant's house on the night of the killing, and defendant was stopped in his automobile and taken into custody at 7:30 A.M. the following morning. The officers detected a strong smell of gasoline from defendant's vehicle and hat. After an attempted arraignment, where there was some discussion regarding count five in the multiple count warrant, defendant was overheard to make the following unsolicited statement: "They count five. They say I killed five people. I only kill one. Why do they count five now?"

Defendant, whose native language is Arabic, testified at trial through an interpreter, although he frequently answered questions in English. His testimony described his relationship with Margo, during the twelve days she first lived with him as that of a husband and wife, just as it was when she again stayed with him. Margo allegedly began stealing from defendant and only moved out the second time after defendant assured her that he would be her boyfriend and would come to visit her everyday and pay the

---

[3] Defendant worked as a meat cutter in a grocery store.

rent. However, when defendant came over after working late one night, he found Margo in the company of "John" and "Don." The three of them were drunk and Margo was wearing only a slip. After that, defendant stopped going to Margo's house.

According to defendant, around 3:00 P.M. on the day of the incident, Margo came to defendant's home and demanded that he sign over his house, and car to her. She also commanded him to give her all the money he had in the bank, and to vacate the house, taking only his clothes, but leaving the furniture. Defendant refused, so Margo took his car. She returned later, along with her children, in a different car, claiming that defendant's car was broken and that Steve had taken it to get it fixed. Margo drove defendant to her house, and he played with Margo's children while waiting for Steve to return with defendant's car. Margo's daughter brought a mask into the room and defendant and the children played with it.

The events that defendant next described are somewhat muddled by the circumstances that gave rise to the trial court and the Court of Appeals determinations that defendant was denied the effective assistance of counsel. Specifically, defense counsel failed to clarify who defendant was identifying as his story unfolded. Defendant mispronounced certain names, and the interpreter made certain incorrect translations of what defendant said. However, as it was told to the jury, somebody named "Cherry" arrived, then within ten minutes Steve came home and denied being in possession of defendant's car. Margo then said that John had defendant's car. Then John, Jim, and "Rose" (and apparently "Don") entered the residence, with John and "Don" being armed with what

the interpreter described as "a small gunshot, black"
and a shotgun. These men ordered defendant to pay a
$3000 drug debt owed by Margo, and defendant tried
to talk them into postponing payment until the next
day. John ordered defendant to sign a piece of paper,
but defendant crushed it and threw it back in John's
face.

The jury heard that John drew his gun while Margo
yelled "kill him outside." Steve tried to grab John's
hand, and defendant began fistfighting with "Jimmy."
Defendant's blows caused Jimmy to bleed and run
away, so defendant then engaged "Rose" in a fight
that began inside and continued outside on the con-
crete. Defendant heard a shot and then "Cherry" came
out and said "John kill Steve." Then John emerged
from the house holding a black gun that had a nine-
shot capacity. John ran "to Don Andrews," then "Don"
came out of the house and tried to hit defendant with
his shotgun, so defendant began fighting "Don" and
"Rose" simultaneously. Defendant disabled "Don" with
a kick between the legs, then made his way down the
street where he found his car and effected an escape.

Defendant then recounted that he went home and
had a beer. Feeling hungry, he went out for a kabob,
and stopped at a store. After returning home, he
drank a second beer, then slept until it was time to
get up for work. He was stopped and arrested on his
way to work the next morning.

Although defendant did not raise insanity as a
defense at trial, he was cross-examined, over a
defense objection to inadequate foundation, regarding
whether he gave a version of the relevant events to
Dr. Mae Keller, a clinical psychologist who had inter-
viewed him pursuant to a notice that he intended to

interpose an insanity defense. Defendant was further questioned regarding a different version that he had supposedly given to Keller. Keller was then permitted to testify, over a defense objection on the basis of privilege, as a rebuttal witness that defendant described routine activities on the day and night in question, and that these activities did not include even being at Margo's house.

Following defendant's sentencing, the Court of Appeals granted his motion to remand for a *Ginther*[4] hearing on defendant's claim that he was denied the effective assistance of counsel. At that hearing, defendant testified that: "Cherry" was Steve's girl-friend,[5] "Jimmy" was Cherry's brother and Margo's boyfriend, "Don" was prosecution witness Danny Parenteau, "Rose" was prosecution witness Russell Parenteau, and "John" was prosecution witness John Talarico. Errors by the interpreter at trial were noted. Defendant had not said that John entered holding a "gunshot," but had stated that John entered, then "Don" entered holding a small black machine gun. Also, defendant had not said that John was running "to Don Andrews," but had said that John was run-ning "to Don and Rose's," meaning that John ran toward the house of Danny and Russell.

Defendant's trial counsel testified that he did not notice that defendant was saying "Rose" instead of "Russ" and "Don" instead of "Dan," and that it was

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[5] At defendant's preliminary examination, Margo testified that defend-ant had a relationship with a woman named either "Sherry" or "Cherry" Smith. At trial, Margo identified this person as Sherry. At the *Ginther* hearing, the prosecutor made an offer of proof that Janice Burge could testify that her son, Steve, did not have a relationship with anyone named "Cherry" and that Margo had been Steve's girlfriend.

possible that he had become accustomed to his client's accent. Further, defendant's counsel conceded that from his first contact with defendant until the end, defendant made major adjustments in his story. Originally defendant claimed not to have been present at Margo's on the night of the killing. The evolving events, as defendant claimed to remember them, formed the basis for the defense theory of the case.

The trial court found that defense counsel had been ineffective on the basis of a number of factors. The Court of Appeals affirmed a subsequent order granting a new trial on the basis of counsel's failure to present defendant's side of the story in clear terms, as well as the admission of the testimony of the forensic psychologist.

II

We first address the admission of testimony regarding statements made by defendant to a forensic psychologist in contemplation of interposing an insanity defense.[6] The Legislature has provided:

> Statements made by the defendant to personnel of the center for forensic psychiatry, to other qualified personnel, or to any independent examiner during an examination

---

[6] Legal insanity is an affirmative defense to a crime in Michigan. MCL 768.21a; MSA 28.1044(1). A defendant in a felony case who wishes to interpose an insanity defense, must serve written notice on the court and the prosecutor not less than thirty days before trial and submit to a court-ordered examination, relating to the claim of insanity, by personnel for the center for forensic psychiatry or other qualified personnel. MCL 768.20a(1) and (2); MSA 28.1043(1)(1) and (2). A defendant or the prosecutor may also obtain independent psychiatric examinations. MCL 768.20a(3); MSA 28.1043(1)(3). The failure by the defendant to fully cooperate in either the court-directed or independent examinations, bars the defendant from presenting testimony relating to insanity at trial. MCL 768.20a(4); MSA 28.1043(1)(4).

> shall not be admissible or have probative value in court at
> the trial of the case on any issue other than his or her
> mental illness or insanity at the time of the alleged offense.
> [MCL 768.20a(5); MSA 28.1043(1)(5).]

This is a clear expression by the Legislature that these statements cannot be admitted at trial except on the issue of insanity, and it is also clear that, under the precedent that the trial court was obligated to follow, no exception to this rule existed for impeachment. See *People v Jacobs*, 138 Mich App 273, 276-278; 360 NW2d 593 (1984). Hence, the admission of testimony regarding these statements was error,[7] but the question remains whether this was error that now requires reversal.

Defense counsel objected to the testimony of the forensic examiner on the ground that the communication was privileged. The communication was, in fact, privileged from admission for any purpose other than defendant's mental illness or insanity at the time of the alleged offense. MCL 768.20a(5); MSA 28.1043(1)(5); *Jacobs, supra* at 276-278. However, had the proper statutory provision and controlling case law been brought to the trial court's attention, the trial court surely would not have admitted the now challenged statements and testimony. Hence, the trial court's decision was nothing more than an erroneous evidentiary ruling at trial. Nonetheless, the dissent would bootstrap this mistake into constitutional error by asserting that the statutory scheme requiring

---

[7] We express no opinion here on whether MCL 768.20a(5); MSA 28.1043(1)(5) requires a court to sit by while testimony known to the court to be perjury is introduced. We have previously stated that a defendant has "no right, constitutional or otherwise, to testify falsely . . . ." *People v Adams*, 430 Mich 679, 694; 425 NW2d 437 (1988).

defendant to cooperate with the examiner on pain of losing the insanity defense placed him in a coercive situation. That is, claims the dissent, defendant was forced to choose between his constitutional right to assert a substantial defense[8] or to give up his constitutional privilege to be free from compelled self-incrimination.[9] With all respect to the dissent, we fail to see when defendant was actually put to such a choice.

It is well settled that the right to assert a defense may permissibly be limited by "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence," *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973). This Court has previously recognized that limitations placed on raising the insanity defense, pursuant to the procedures established in MCL 768.20a; MSA 28.1043(1), do "not unconstitutionally infringe on a defendant's right to present a defense." *People v Hayes*, 421 Mich 271, 283; 364 NW2d 635 (1984).

If the established rules of procedure found in MCL 768.20a; MSA 28.1043(1) do not impermissibly limit a defendant's right to assert the insanity defense, it follows that no aspect of defendant's decisions regarding: (1) providing notice of intent to raise the defense; (2) cooperating with the examiner; or (3) abandoning the insanity defense, was the product of impermissible coercion. The eventual erroneous ruling by the trial court, which occurred well after both the exami-

---

[8] See *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973); *People v Whitfield*, 425 Mich 116, 124, n 1; 388 NW2d 206 (1986); *People v Hayes*, 421 Mich 271, 278; 364 NW2d 635 (1984).

[9] US Const, Am V; Const 1963, art 1, § 17.

nation and defendant's decision to abandon the insanity defense, could not have reasonably been anticipated by assessing the extant rules of procedure. If the mere possibility that a court will apply the law incorrectly gives rise to a justified reluctance to provide full disclosure to the examiner or to avail oneself of an available defense, then defendant's right to present an insanity defense would have been equally infringed even if the trial court had later correctly refused to admit any testimony regarding his statements to the examiner. This is so because any coercion to defendant's detriment was complete by the time the court ruled on this issue.

Likewise, we cannot accept the dissent's position regarding the effect on future defendants of affirming defendant's convictions. The dissent assumes that a failure to reverse defendant's conviction will have a chilling effect on access to the insanity defense. The dissent reaches this conclusion despite our present conclusion that the admission of testimony regarding the forensic interview constituted error. Hence, its conclusion appears necessarily to be premised upon future disregard by the trial courts of this Court's present holding.

The dissent also asserts that this error violated due process because defendant was lured into speaking with the forensic psychologist by a statutory promise that his statements would not be used against him at trial, and the admission of those statements broke that promise. We agree with the proposition that if a criminal defendant relies on a promise from the state and the state breaches that promise, the state must provide a remedy for any resulting due process violation. See, e.g., *People v Gallego*, 430 Mich 443; 424

NW2d 470 (1988). Fundamental notions of due process dictate that if the resulting breach contributes to a defendant's conviction, reversal is warranted. See *People v Wyngaard*, 226 Mich App 681, 695; 575 NW2d 48 (1997) (MARKMAN, J., concurring in part and dissenting in part). However, if every error in the application of a rule of evidence or criminal procedure was treated as a breach of a governmental promise, just as if it had been specifically made to an individual defendant as part of a plea bargain or to secure testimony, all trial errors would violate due process. While we are not oblivious to the similarity between this statute's protection and a specific promise that a defendant's statements will not be used against him, we conclude that the two are sufficiently distinguishable to justify a rejection of the proposition that every trial error effectively presents a constitutional violation. In any event, as we shall explain, our resolution of whether the error here rises to the level of a constitutional violation does not affect the outcome in this case.

Consequently, this is preserved nonconstitutional error,[10] and our harmless error analysis entails the application of the rule this Court announced in *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). "The object of this inquiry is to determine if it affirmatively appears that the error asserted 'undermine[s] the reliability of the verdict.'" Such error does not require reversal unless, in the context of the untainted evidence, "it is more probable than not that a different outcome would have resulted without the error." *Id.*

---

[10] *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999).

The first step in determining whether this error was harmless is to assess its potential prejudice to defendant. The prosecutor, of course, introduced this evidence to impeach defendant's credibility. To the extent that this was accomplished, it was achieved by the jury's appreciation of a logical syllogism that goes something like this: (1) defendant lied to the forensic psychologist about the incidents in question; (2) this shows that defendant has a propensity for untruthfulness, particularly with regard to this incident; therefore, (3) the jury should not believe defendant's trial testimony with regard to this incident. However, the prejudice of the tainted evidence cannot be measured in a vacuum. Rather it must be measured in context. By defendant's own testimony, after being present at the killing of Steve Burge, he went home and did not call the police. He made no arrangements for his own personal security, but, rather, engaged in a number of routine activities such as going out to eat, stopping for groceries, getting a night's sleep, and rising and going to work. Putting aside its limited believability, the best interpretation of this testimony that is consistent with defendant's innocence is that defendant did not want to be drawn into the investigation of this killing and was going to pretend that he was not there. Consequently, there is very little additional prejudice to defendant from the jury learning that, at a subsequent point, he claimed that he was not present when Steve was killed. This is so because most of this prejudice was already present from defendant's own untainted testimony, and defendant's false statement to the forensic psychologist was consistent with the interpretation of defendant's postkilling conduct that was the most favorable to him.

By contrast, the untainted evidence pointing to defendant's guilt is overwhelming. In an unsolicited statement, defendant essentially admitted the crime, saying: "They count five. They say I killed five people. I only kill one. Why do they count five now?"[11] Two eyewitnesses positively identified defendant as the assailant, and, by his own testimony, he was present when Steve was killed. Defendant claimed that he was the intended robbery or extortion victim of the real killers, but took no precautions for his safety, did not call the police, and engaged in routine behaviors immediately after the killing. Margo testified about a pattern of stalking by defendant that was corroborated by her neighbors. Defendant's attempt to explain his frequent presence, by claiming that his promise to visit her everyday was the only way he could get Margo to move out of his house, defies common sense.[12]

Defendant's testimony is inconsistent with the physical evidence, while the testimony of Margo and

[11] The dissent does not characterize defendant's unsolicited statement as an admission. Rather, the dissent believes, given defendant's poor command of the English language, that this could have been an expression of defendant's incredulity at being charged with three counts of murder when only one man died. *Post* at 326-327. We find that to be a highly improbable interpretation of "I only kill one." We view it to be objectively more probable that reasonable triers of fact would interpret defendant's statement as an expression of incredulity at being charged with what he thought were five murder counts after having only killed one person. This is particularly true in light of Margo's testimony that defendant spoke and understood English reasonably well.

[12] The dissent finds it reasonable that Margo "would not leave without assurances of [defendant's] continued presence and her continued financial security." *Post* at 325. We concede that it does not defy common sense for defendant allegedly to have agreed to onerous conditions in order to secure the departure from his house of an unwelcome thief. What more defies common sense is that defendant would adhere to such conditions after Margo had moved out and had established residence elsewhere.

her neighbors does not conflict.[13] The fingertip of a
rubber or latex glove found at the scene is consistent
with Margo's testimony that the masked assailant
wore light colored surgical gloves, as well as the fact
that there was a struggle during which Danny kept
defendant from pointing his weapon at him. The pos-
session by, and availability to, defendant of such
gloves supports the prosecutor's case. It is undisputed
that Steve was not only shot in the jaw, but doused
with gasoline. Defendant was arrested the next morn-
ing reeking of gasoline. The recovery of a hat with a
wig sewn to it, along with a mask that had tape on it
bearing defendant's fingerprints, is consistent with the
theory that defendant arrived at Margo's house
dressed in a manner calculated to conceal his iden-
tity. Defendant's claim that Margo's daughter brought
the mask into the room and that defendant played
with it, does not explain the wig-hat or why the mask
was recovered by the police from the sidewalk in
front of the house. Nor does anything in defendant's
account explain why he would calmly accompany
Margo to her home, then bide his time in idle play
with her children waiting for the return of his car,

---

[13] The dissent latches onto an argument made by defense counsel at
trial that, although Margo testified that the assailant kicked open her front
door from the outside, the only damage was to the storm door, which was
bent outward. From this, defense counsel argued that the door was dam-
aged by someone trying to get out, and not by someone forcing their way
in, and that this supported defendant's version of events. However, Margo
never testified that her interior door had been locked, there is no reason
to presume that the doorknob was not turned before the kick was deliv-
ered, and Margo specifically stated on cross-examination that the door
was not damaged when it was kicked open. Moreover, the fact that the
exterior storm door was broken outward is consistent with Danny
Parenteau's testimony that he saw Steve fighting a man inside the front
door of Steve's house and that Steve forced the man out through that
door.

after Margo had supposedly demanded he give her his house, his furniture, and his money, and had stolen his car.

If someone named Cherry had come out of the house and said "John kill Steve," that statement would have been inaccurate when made. Steve was alive and still conscious when the police arrived, and he remained alive for another twenty hours. It was decidedly convenient for defendant that Cherry would make this inaccurate statement, thus permitting defendant to be removed from the place of the killing, yet still be able to identify John as its perpetrator. Defendant's story that Steve was shot inside the house while defendant was outside fighting others does not explain the large amount of blood found outside the house and on the broken exterior door. Defendant's story that John emerged from the house carrying a gun that had a nine-shot capacity imputes knowledge to defendant that is unlikely under the circumstances that he recounted. Defendant's claim to have prevailed in a fistfight with three men, two of whom were armed, is less than credible. Likewise, it appears to be a significant coincidence that defendant not only had his car keys with him, but was able to immediately locate his car when fleeing from armed assailants. By his account, his car had been taken from him earlier in the day and he was driven to Margo's house in a different car.[14]

---

[14] The dissent discounts the overall implausibility of defendant's testimony because, among other things: (1) a witness who saw someone shot in the face might have exclaimed that the person had been killed; (2) it is believable that defendant could have serendipitously found his car to effect an escape; and (3) defendant might have engaged in routine conduct after the killing out of shock, mental imbalance, or distrust for the police. However, we do not view these aspects of defendant's story as

On one side of the scale, we have the consistent testimony of several eyewitnesses, the physical evidence, and defendant's unsolicited admission. On the other side, we have defendant's version of events that would be unbelievable even if not contradicted. Given the damage that defendant's own story did to his credibility, and the enormity of the untainted evidence, we conclude that any error stemming from the jury learning that defendant had, at some point, denied being at the scene to a psychologist was harmless. Defendant has not established that it is more probable than not that a different outcome would have resulted without the error.

In fact, the evidence in this case is so substantial that, even if we were to analyze this as constitutional error under a due process theory (e.g., that defendant was enticed to give up his privilege to be free from compelled self-incrimination and speak to the forensic examiner by the statutory assurance that his statements could not be used for the purpose for which they were ultimately admitted), we would, nevertheless, conclude that the error was harmless.[15] It is

---

conclusive evidence of his guilt. A brick is not a wall, and the credibility of defendant's story cannot be measured by viewing its elements in isolation. Instead, we consider the entire panoply of improbable or highly coincidental elements in defendant's testimony to be significant. This is particularly so in light of the more reasonable explanations that were offered by the prosecutor's witnesses, which were consistent with the physical evidence.

[15] Constitutional error is either structural and subject to automatic reversal, or it is nonstructural and requires reversal only if the improperly admitted evidence, in light of the properly admitted evidence, was not harmless beyond a reasonable doubt. *Arizona v Fulminante*, 499 US 279, 309-310; 111 S Ct 1246; 113 L Ed 2d 302 (1991); *People v Anderson (After Remand)*, 446 Mich 392, 404-406; 521 NW2d 538 (1994). Even the admission of involuntary confessions, which was once considered to be structural error, is currently understood to be subject to harmless error analysis. *Fulminante, supra* at 308-310; *People v Howard*, 226 Mich App 528,

clear to us that the prejudice from the improperly
admitted evidence, in view of the untainted evidence,
was harmless beyond a reasonable doubt.

III

We next address the Court of Appeals holding that
defendant was denied the effective assistance of
counsel because his attorney failed to clarify his testi-
mony so that it was presented in a way that was more
comprehensible to the jury. Specifically, defendant
contended, inter alia, that his trial counsel should
have asked follow-up questions that would have clari-
fied the action described by defendant and made it
clear to the jury that the true offenders, as described
by defendant, included all of the most damning of the
prosecutor's eyewitnesses.

For a defendant to establish a claim that he was
denied his state or federal constitutional right to the
effective assistance of counsel, he must show that his
attorney's representation fell below an objective stan-
dard of reasonableness and that this was so prejudi-
cial to him that he was denied a fair trial. *Strickland
v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L
Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 303;
521 NW2d 797 (1994). As for deficient performance, a
defendant must overcome the strong presumption
that his counsel's action constituted sound trial strat-
egy under the circumstances. *People v Mitchell*, 454
Mich 145, 156; 560 NW2d 600 (1997). As for prejudice,
a defendant must demonstrate "a reasonable prob-

___

543; 575 NW2d 16 (1997). There is nothing about the error in this case
that would compel a more rigorous test than that applied to coerced
confessions.

ability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . ." *Id.* at 167. We conclude that counsel's failure to elicit elaborative testimony from defendant was neither deficient nor prejudicial.

As defense counsel's testimony at the *Ginther* hearing established, defendant's story, as he claimed to remember it, evolved during the course of his representation from not having been at the scene of the crime, to being present, but not being the shooter. Defense counsel conceded that defendant's latest version of events did not comport with the physical evidence. Under these circumstances, no reasonably competent attorney would have thought it advisable for defendant to relate his story in sufficient detail to enable its veracity to be checked by comparing it to the physical evidence or subjecting it to precise cross-examination.[16]

The dissent states that, at the *Ginther* hearing, defense counsel "admitted having failed to prepare or review with defendant specific questions he would ask." *Post* at 312. Actually, defense counsel denied

---

[16] It may well be that defense counsel's failure to nail down the details of defendant's story before trial was the only way that counsel could aid defendant in presenting his story within counsel's ethical obligation not to knowingly offer evidence that counsel knows to be false. While a defendant may have the constitutional right to the effective assistance of counsel, this does not encompass the right to assistance of counsel in committing perjury. In fact, an attorney's refusal to knowingly assist in the presentation of perjured testimony is not only consistent with his ethical obligations, but cannot be the basis of a claim of ineffective assistance of counsel. *Nix v Whiteside*, 475 US 157, 174-175; 106 S Ct 988; 89 L Ed 2d 123 (1986). See also *United States v Grayson*, 438 US 41, 54; 98 S Ct 2610; 57 L Ed 2d 582 (1978) ("Counsel ethically cannot assist his client in presenting what the attorney has reason to believe is false testimony"); *Adams*, n 7 *supra*, 430 Mich 694 ("there is no right, constitutional or otherwise, to testify falsely"); MRPC 3.3(a)(4) ("A lawyer shall not knowingly . . . offer evidence that the lawyer knows to be false").

failing to review with defendant the questions he would be asking, and only conceded that he "did not specifically write out the questions [he] was going to ask . . . ." Moreover, defense counsel testified that he visited defendant in jail a tremendous number of times to enlist defendant's aid in preparing the defense. Defense counsel expressly stated, "we prepared [defendant] as best we could" and he estimated spending ten to twelve hours specifically preparing defendant to take the stand.[17]

A defendant's decision whether to testify on his own behalf is an integral element of trial strategy. For a variety of reasons, many defendants, under the advice of counsel, do not take the stand, presumably concluding that the advantages of doing so would be outweighed by the disadvantages. It is likely that a great many of those who do not take the stand would be less hesitant to do so if, like defendant, they could plausibly tell the jury that they did not commit the crime with which they are charged, while advancing an alternative exonerating theory in general and somewhat unintelligible terms, thus effectively precluding detailed cross-examination.[18] Even if this was

---

[17] The dissent also suggests that defense counsel affirmatively asserted that it did not occur to him that clarification of defendant's testimony was needed because counsel had become accustomed to defendant's accent. In fact, defense counsel only conceded appellate counsel's theory that it was *possible* that acclimation was the reason why he did not notice the mispronunciations.

[18] The dissent does not accept that the prosecutor's ability to cross-examine defendant was impaired by the fact that defendant's direct testimony was not detailed. The prosecutor could possibly have exposed the weaknesses in defendant's story by asking the clarifying questions that, according to the dissent, defense counsel should have asked. However, defense counsel was aware of the fact that defendant's story was inconsistent with the physical evidence, whereas the prosecutor would have been on a fishing expedition. Although the prosecutor was not prohibited from

not counsel's express plan, it would have been dangerously inept of him to intentionally provide defendant with the opportunity to offer more details such as the magazine capacity of John's gun. The supposed language barrier[19] in this instance provided defendant with a way for the jury to see him deny committing this crime, yet plausibly not let them hear his story in a manner in which its incredible nature was completely clear to them.[20]

---

clarifying defendant's testimony, many experienced trial attorneys would agree that it is rarely sound practice to ask questions before the jury without first knowing the answer. Defense counsel may well have viewed the prosecutor as being reasonably competent when deciding on the merits of eliciting elaborative testimony from defendant.

[19] In addition to Margo's trial testimony that defendant understood and spoke English reasonably well, at the *Ginther* hearing, defense counsel testified: "when I first met with [defendant], he spoke to me in English, but I was always concerned that he didn't understand the nuances of our language."

[20] The dissent claims that defense counsel's decision not to clarify defendant's version of events "allowed the prosecution to argue effectively that defendant's testimony was a figment of his imagination, undermining his credibility in the eyes of the jury." *Post* at 313. In fact, the prosecutor did ridicule defendant's testimony as ludicrous and unintelligible. Although the prosecutor's characterization of what the jury heard is valid, it is questionable whether defendant could have possibly fared better had the prosecutor and jury been privy to defendant's "clarified version" at trial. The preliminary examination testimony reveals that Russell and Danny were watching Monday Night Football in the company of eight other friends and family members (including their mother, their sister, their sister's boyfriend, and their sister's children) when the first shot was heard. Would defendant have been better off if the prosecutor, having fully comprehended defendant's version, called each of these individuals to testify in rebuttal that Danny and Russell were not at Margo's when the first shot was heard? Would defendant have been better served if the clarified version had been presented and the prosecutor had noted in closing argument how impossible it would have been for the various members of this neighborhood to have conspired to frame defendant, including coming up with consistent stories and planting incriminating physical evidence, in the few minutes before the police arrived and while Steve was still conscious and speaking? As ludicrous and unintelligible as defendant's testimony was, a more palatable alternative was not available to defense counsel.

The dissent states that defense counsel did not testify that he thought defendant's story was a fabrication[21] and that defense counsel found that defendant's story "made sense and rebutted the theory of the prosecution." *Post* at 312. The closest that defense counsel's testimony came to that proposition was when he stated:

> Well, it's troubling, you know, when you're trying to prepare a defense and the client tells you one thing and the physical evidence clearly points in a different direction, and there are certain things you have to own, I mean, you have to bite the bullet when comes to certain things, but, ultimately, you know, what he told us seemed to make sense, some sense.

We cannot agree with the dissent's characterization of this testimony in light of defense counsel's acknowledgment that defendant made "major adjustments" in his story and that the theory of the defense was based on events of the evening as defendant *ultimately* "claimed to remember them."

Moreover, finding that counsel was deficient presumes that, as of trial, defendant's version of events was as developed as it was by the time of the *Ginther* hearing. Given counsel's testimony about the evolving nature of defendant's story, it is just as likely that, having sat through trial, defendant merely tried

---

[21] The dissent misinterprets our position as arguing "that the reason defense counsel did not clarify his client's testimony is because he believed it was fabricated." *Post* at 312. Actually, we do not go so far as to presume that fact, but merely acknowledge that, when faced with a constantly evolving story from one's client, a reasonably competent and ethical attorney might well elect to consciously maintain uncertainty with regard to his client's explanation, and avoid highlighting details of that explanation that are inconsistent with the physical evidence or that are otherwise highly suggestive of the explanation's falsity.

to cover as many details presented in the prosecutor's case as possible, and he experienced trouble keeping his story and names straight. With the passage of time, and the assistance of a transcript, perhaps defendant was able to refine this story. This does not demonstrate that counsel was deficient at the time of trial for not knowing what defendant would later "remember."

Finally, we fail to see how defense counsel's conduct could have been prejudicial to defendant, given not only the enormity of the evidence against defendant as discussed in part II, but also the fact that defendant's clarified testimony (as elicited at the *Ginther* hearing) is hardly more believable than the somewhat garbled version presented at trial.[22] It is

---

[22] The dissent seeks our comment on the fact that the jury deliberated for two and a half days before convicting defendant on only six of the ten charges. To the dissent, this demonstrates that the jury was reluctant to convict defendant. The dissent further reasons that this means that the evidence against defendant on the counts of which he was convicted was not overwhelming, and that what the dissent perceives to be counsel's errors were necessarily prejudicial. *Post* at 313-314, 327-328. We are not persuaded by the dissent's reasoning. All that the record reveals is that, after two and a half days of deliberation, the jury informed the court that it had reached verdicts on the first six charges, but was deadlocked eleven to one, and ten to two on the charges of assault with intent to commit murder regarding Danny and Russell Parenteau, along with the concomitant charges of felony-firearm. After receiving the verdicts on the first six counts, the court declared a mistrial on the remaining charges.

We know of no sound method or good reason for attaching significance to the amount of time jurors spend deliberating. Perhaps they agreed on the first six charges in an hour and spent the rest of the time debating the counts on which they eventually could not reach consensus. Given that this jury must have rejected defendant's version of events in order to convict him of the first six charges, if we were forced to speculate regarding the significance of the jury becoming deadlocked, we would most likely conclude that the jury could not agree on whether it had been proven that defendant had formed the specific intent to murder Danny and Russell Parenteau. Although this is admittedly speculation, which deserves no more credence than the dissent's speculation, it exposes the error in the dissent's determination that the jury was reluctant to convict defendant.

not more believable that John was holding a machine gun than a shotgun, and, given that .38 caliber casings were found at the scene, defendant's best alternative was to have the jury hear this weapon described as "a small gunshot, black." The jury was not in possession of transcripts, so they would not necessarily have understood defendant's mispronunciations in the same way as the transcriber (e.g., hearing "Rose" when defendant was referring to "Russ"). The defense theory was clear that a number of people who were present during the killing were trying to shift the blame to defendant. Under defendant's version of events, these unclearly identified persons, out of necessity, would have included John Talarico, Danny Parenteau, and Russell Parenteau. Confusion by defendant about the exact identities of those trying to rob or extort him at gunpoint was consistent with his theory, and more believable than the potential "details" that defendant later demonstrated that he was capable of adding.

The Court of Appeals noted that defendant's testimony offered the only direct rebuttal of the prosecutor's theory. However, effective rebuttal is accomplished only if defendant's testimony *is believed*. The problem with defendant's clarified version is that it is so unbelievable that defendant was arguably better off letting the jury speculate about what he was really trying to say, and hoping the jurors would rely on

Our present holding is not premised on overwhelming evidence of defendant's intent to murder Danny and Russell, and there is nothing from which to conclude that the jury was reluctant to convict on the counts where it did so. Moreover, the limited success of achieving a mistrial on four counts could easily be viewed as a testament to the efficacy of counsel's chosen strategy, rather than as evidence of deficient performance that was prejudicial to defendant.

defense counsel's opening statement regarding what the facts would show. Consequently, defendant did not demonstrate that, by failing to clarify his testimony, his trial counsel's performance fell below an objective standard of reasonableness and that this was so prejudicial that he was denied a fair trial. Rather, defendant's trial was fundamentally fair and the verdict is reliable.[23]

CONCLUSION

We hold that any error stemming from the admission of the testimony regarding statements given to a forensic psychologist by defendant in compliance with MCL 768.20a; MSA 28.1043(1) was harmless. We also hold that defendant was not denied his right to the effective assistance of counsel on the basis of his counsel's failure to ensure that his testimony about what occurred was presented to the jury in a different manner. Defense counsel's performance was neither deficient nor prejudicial in this regard. Consequently, we reverse the judgment of the Court of Appeals and, because defendant raised issues in his cross appeal not addressed by the Court of Appeals, we remand this case to that Court for consideration of the unaddressed issues.

---

[23] The dissent concludes that "allow[ing] defendant's convictions to stand makes a mockery of the law's concern for a fair trial and damages public respect for the judicial process." *Post* at 328. Respectfully, such hyperbole is hardly supported by a thorough review of the record. No trial is error free, and, in our judgment, "public respect" for the judicial process is justifiably diminished when criminal convictions are set aside on the basis of mistakes that do not truly prejudice the defendant or damage the integrity of the criminal justice system. We leave it to the public itself to determine which of the alternative opinions in this case is more genuinely "damaging of public respect" for the judicial process.

Weaver, C.J., and Taylor and Corrigan, JJ., concurred with Markman, J.

Kelly, J. I disagree with the majority's conclusion that defendant was not deprived of effective assistance of counsel. Moreover, the trial court committed constitutional error by permitting the forensic examiner to testify for purposes of impeachment, in violation of MCL 768.20a(5); MSA 28.1043(1)(5). This error does not survive harmless error review. Therefore, I would affirm the Court of Appeals decision reversing the defendant's convictions on both grounds.

### I. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The denial of effective assistance of counsel violates a defendant's Sixth Amendment right to a fair trial.[1] *People v Lloyd*, 459 Mich 433, 446; 590 NW2d 738 (1999). Appellate courts address constitutional issues under a de novo standard of review. *McDougall v Schanz*, 461 Mich 15, 24; 597 NW2d 148 (1999).

To establish ineffective assistance of counsel, a defendant must show that the attorney's representation fell below an objective standard of reasonableness compared to professional norms. *People v Pickens*, 446 Mich 298, 309; 521 NW2d 797 (1994). He must show that the ineffective assistance so prejudiced him that he was deprived of a fair trial. *Id.* To demonstrate the requisite prejudice, a defendant must prove that, but for errors of counsel, there

---

[1] In relevant part, the Sixth Amendment to the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy . . . the Assistance of counsel for his defence. [US Const, Am VI.]

was a reasonable probability of a different outcome.[2]
*Id.* at 314.

### A. OBJECTIVE STANDARD OF REASONABLENESS

Adil Toma has poor command of the English language and an Arabic accent. He testified with the aid of an interpreter, and his testimony was often disjointed and confusing. Frequently, it was unclear who defendant was referring to in his recitation of events and whether they were the same as those the prosecution alleged were involved.

The defense attorney failed to clarify who defendant implicated in the shooting. He allowed defendant to identify people only by their first names. Defendant said that Steve Burge's girlfriend was "Cherry," and Margo DeVita's boyfriend was "Jimmy." None of the prosecution witnesses mentioned these names. They all stated that Margo's boyfriend was Steven Burge. Defendant's attorney never explained that the persons defendant referred to as "Rose" and "Don" were prosecution witnesses Russell and Danny Parenteau.

Defense counsel did not ask defendant or the interpreter to correct mispronunciation of the names. He failed to ask follow-up questions of defendant to clarify his testimony and to correct errors of translation, in the interest of making the testimony coherent.

Counsel's failure to clarify his client's testimony was not a matter of trial strategy. In *Lloyd, supra,* defense counsel was found not ineffective for choos-

---

[2] This two-pronged test for ineffective assistance of counsel is derived from the standard set forth by the United States Supreme Court in *Strickland v Washington,* 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); see n 8.

ing one of two incompatible defenses, although both were weak, due to significant evidentiary problems. *Id.* at 448. Here, by contrast, there was only one viable defense theory. And, trial counsel failed adequately to aid defendant in its presentation.

The majority argues that the reason defense counsel did not clarify his client's testimony is because he believed it was fabricated. The testimony, clarified, would have been even more damaging.

However, at the *Ginther*[3] hearing, defense counsel did not testify that he thought defendant's version of the events was a lie. The explanation he gave for failing to clarify the mispronunciations of names was that, having spoken with defendant at length, he may have become accustomed to his pronunciation and accent. Thus, it did not occur to him that clarification for the jury was needed.

At the *Ginther* hearing, the defense attorney stated that defendant's version of the events made sense and rebutted the theory of the prosecution. He admitted having failed to prepare or review with defendant specific questions he would ask.

Defendant's testimony, if clarified, could not have been more damaging than it was in its garbled and unintelligible state. I disagree that failing to clarify the testimony could have been a strategy to effectively preclude detailed cross-examination by the prosecution. Defense counsel's presentation of incomprehensible testimony did not prevent the prosecution from asking questions on cross-examination to clarify defendant's theory of the case. The prosecution was in no way deterred from exposing defendant's posi-

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

tion as, in the words of the majority, "incredible" and "inconsistent with the physical evidence."

Defense counsel's shortcomings allowed the prosecution to argue effectively that defendant's testimony was a figment of his imagination, undermining his credibility in the eyes of the jury. The presentation of his client's testimony was indispensable to the creation of the defense's theory of the case. Counsel's role in its presentation failed to meet the objective requirements for reasonable assistance of counsel when compared to professional norms. In fact, he was responsible in large part for the unintelligibility of defendant's testimony.

### B. REASONABLE PROBABILITY OF A DIFFERENT OUTCOME

Defendant's description of the night's events was coherent and internally consistent when it was clarified at the *Ginther* hearing. The people defendant listed as present are largely the same as the prosecution listed. Defendant's version of the events names the four key prosecution witnesses and explains their motivation to lie and implicate him in the shooting.

The jury deliberated for approximately two and a half days, became deadlocked, and asked to hear defendant's testimony again. Ultimately, it did not find defendant guilty of the two counts of assault with intent to commit murder, nor of the felony-firearm charges based on those assaults.[4] These facts support

---

[4] The majority correctly notes in footnote 1 that the prosecution brought ten counts against the defendant and the jury convicted him on six of them. However, the counts of first-degree murder and felony-murder based on two different underlying felonies were cumulative, alternative theories of conviction for the murder of Steven Burge. Double jeopardy would permit conviction on only one of the three counts. Likewise,

a finding that the errors of counsel were outcome determinative.

At the *Ginther* hearing and on appeal, the prosecution argues that defense counsel's errors did not affect the jury's verdict, because the evidence against defendant was overwhelming. I disagree. This was no "open-and-shut" case. Not only did the errors of counsel prevent defendant from intelligibly presenting his theory of the case, they actually bolstered the prosecution's case. They permitted the people to argue that defendant was imagining or fabricating his version of the events.

This is not a case where the evidence against the defendant was overwhelming. Instead, it is one in which there was a complete failure of the adversarial process, rendering it inevitable that the prosecutor's proofs would seem overwhelmingly persuasive.

### C. FUNDAMENTALLY PREJUDICIAL PROCEEDING

Federal law, explicitly, and Michigan law, by implication in reliance on federal law,[5] allow for reversal

---

only one of the three counts of felony-firearm based on the underlying murder theories could be upheld. Ultimately, the jury could have convicted the defendant on only six charges: (1) murder or felony-murder, (2) felony-firearm based on the murder, (3) assault with intent to commit murder (Danny Parenteau), (4) felony-firearm based on that assault, (5) assault with intent to commit murder (Russell Parenteau) and (6) felony-firearm based on that assault. The jury convicted the defendant on two of the six noncumulative counts.

[5] This Court recently noted that "the Fourteenth Amendment incorporated and made applicable to the states numerous protections contained in the Bill of Rights." *People v Sierb*, 456 Mich 519, 526; 581 NW2d 219 (1998). These rights include the Sixth Amendment right to counsel, see *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963), and the Fifth Amendment's privilege against self-incrimination, see *Malloy v Hogan*, 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964). "This Court has not hesitated to enforce as strictly against the States as it does against the

without considering whether ineffective assistance of counsel amounted to outcome-determinative prejudice. This occurs when the errors of defense counsel render the proceeding fundamentally unfair.

In this case, the errors violated defendant's Fifth Amendment right to testify[6] and his Fourteenth Amendment right to due process,[7] as well as his Sixth Amendment right to counsel.

> [F]ailure to afford the petitioner a reasonable opportunity to defend himself against the charge . . . was a denial of due process of law. A person's . . . opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and [this] . . . include[s], as a minimum, a right . . . to offer testimony, and to be represented by counsel. [*In re Oliver*, 333 US 257, 273; 68 S Ct 499; 92 L Ed 682 (1948).]

---

Federal Government the right[] . . . to a fair, public trial[.]" *Mapp v Ohio*, 367 US 643, 656; 81 S Ct 1684; 6 L Ed 2d 1081 (1961).

[6] The Fifth Amendment to the United States Constitution provides in relevant part:

> No person . . . shall be compelled in any criminal case to be a witness against himself[.] [US Const, Am V.]

While the Fifth Amendment does not expressly include a criminal defendant's due process right to testify in his own behalf, the United States Supreme Court has repeatedly "suggested that such a right exists as a corollary to the Fifth Amendment privilege against compelled testimony . . . ." *Nix v Whiteside*, 475 US 157, 164; 106 S Ct 988; 89 L Ed 2d 123 (1986).

[7] In pertinent part, the Fourteenth Amendment to the United States Constitution provides:

> No State shall . . . deprive any person of . . . liberty . . . without due process of law[.] [US Const, Am XIV, § 1.]

> Although this Court has never explicitly held that a criminal defendant has a due process right to testify in his own behalf, . . . the right has long been assumed. [*Nix v Whiteside*, n 6 *supra* at 164.]

Defense counsel's failure to clarify defendant's testimony so aided the prosecution that it would have been better had defendant not testified at all. Improper translation and clarification made the trial fundamentally unfair in that defendant was unable to put on an intelligible defense. "There are . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v Cronic*, 466 US 648, 658; 104 S Ct 2039; 80 L Ed 2d 657 (1984). "[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee [to the effective assistance of counsel] is violated." *Id.* at 656-657.

Reversible prejudice resulting from ineffective assistance of counsel rendered a criminal defendant can be found without a determination that the errors were outcome determinative under the second prong of *Strickland v Washington*, 466 US 668, 696; 104 S Ct 2052; 80 L Ed 2d 674 (1984):[8]

> [T]he principles we have stated do not establish mechanical rules. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

The Michigan Supreme Court in *Pickens* adopted the *Strickland* version of what constitutes error

---

[8] *Strickland v Washington, supra.* To satisfy the two-pronged *Strickland* test for ineffective assistance, "the defendant must show that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense." *Id.* at 687.

requiring reversal from ineffective assistance of counsel.[9] Defendant was unable to put on any meaningful defense as a result of his counsel's ineffective assistance. He was deprived of a fair trial. This Court need only affirm its past strong reliance on *Strickland* to uphold the Court of Appeals finding of prejudice on the basis of the facts of this case.

## II. THE VIOLATION OF SUBSECTION 20a(5) WAS CONSTITUTIONAL ERROR

"Insanity is everywhere a defense to a charge of crime, for without a sound mind there can be no criminal intent." 2 Underhill, Criminal Evidence (5th ed), § 450, pp 1128-1129.

> [It is a] humane principle, existing at common law . . . that to make a complete crime cognizable by human laws, there must be both a will and an act; and as a vicious will without a vicious act is no civil crime, so, on the other hand, an unwarrantable act without a vicious will is no crime at all. So that, to constitute a crime against human laws, there must be, first, a vicious will, and, secondly, an unlawful act, consequent upon such vicious will. [*Davis v United States*, 160 US 469, 484; 16 S Ct 353; 40 L Ed 499 (1895) (internal quotation marks omitted) (quoting 4 Blackstone, Commentaries 21).]

The Michigan Legislature enacted the present form of this state's insanity defense in 1975.[10]

---

[9] Michigan courts "require a fair trial, not a perfect trial." *Pickens, supra* at 314.

[10] 1975 PA 180. The statute was amended slightly in 1983. The amendment makes the statute gender neutral and states that "other qualified personnel" aside from personnel at a center for forensic psychiatry can conduct the examination required by MCL 768.20a(2); MSA 28.1043(1)(2). 1983 PA 42, MCL 768.20a; MSA 28.1043(1).

[I]nsanity and mental illness are separate defenses with different consequences. . . . "The very definition of legal insanity contained in MCL 768.21a; MSA 28.1044(1),[11] refers to the term 'mental illness.' Insanity by definition is an extreme of mental illness. When a person's mental illness reaches that extreme, the law provides that criminal responsibility does not attach. To put it alternatively, the statutes provide that all insane people are mentally ill but not all mentally ill people are insane." . . . Thus, if a defendant is found to be mentally ill, he may be found not guilty, guilty but mentally ill, or, if he lacks substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, not guilty by reason of insanity. [*People v Smith*, 119 Mich App 91, 95-96; 326 NW2d 434 (1982).]

A defendant wishing to establish insanity at the time of the offense must notify the court and the prosecuting attorney of that intention thirty or more days before trial. MCL 768.20a(1); MSA 28.1043(1)(1). The notice serves to forewarn the prosecutor. *People v Blue*, 428 Mich 684, 690; 411 NW2d 451 (1987). It

---

[11] (1) It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in section 400a of the mental health code, Act No. 258 of the Public Acts of 1974, being section 330.1400a of the Michigan Compiled Laws, or as a result of being mentally retarded as defined in section 500(h) of the mental health code, Act No. 258 of the Public Acts of 1974, being section 330.1500 of the Michigan Compiled Laws, that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. Mental illness or being mentally retarded does not otherwise constitute a defense of legal insanity.

(2) An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances. [MCL 768.21a; MSA 28.1044(1).]

also triggers the defendant's required examination by personnel at a center for forensic psychiatry or by other qualified personnel. MCL 768.20a(2); MSA 28.1043(1)(2).

Failure to submit to the forensic examination and to fully cooperate in it bars a defendant from presenting an insanity defense. MCL 768.20a(4); MSA 28.1043(1)(4). Such preclusion does not violate a defendant's state and federal constitutional rights to present a defense. *People v Hayes*, 421 Mich 271, 283; 364 NW2d 635 (1984).

That right is not absolute, but is subject to the "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973). "The defendant is required to fully cooperate so that the examining psychologist can accurately determine the defendant's competency to stand trial and criminal responsibility at the time of the offense. . . . When . . . the integrity of the evidence of insanity is threatened, the preclusion sanction is warranted." *Hayes, supra* at 282-283.

The limitations of § 20a do not unconstitutionally infringe upon a defendant's right to present a defense *if courts comply with them.* If they do, defendants have notice of the definitive boundaries of the limitations. Section 20a forbids forensic examiner testimony on issues other than insanity, or on any issue at all, if the insanity defense is not ultimately raised.

The truth-seeking function of trial courts would be substantially impaired if a defendant could raise an insanity defense, then assert the psychologist-patient privilege and preclude an examiner's testimony. *Peo-*

*ple v Howe*, 445 Mich 923, 925; 520 NW2d 338 (1994)
(BOYLE, J., dissenting). By raising an insanity defense,
the defendant has placed his mental state at issue and
waived the privilege in that regard.[12] *Id.*

However, the integrity of evidence of insanity is
likewise threatened if the examining forensic psychol-
ogist is permitted to testify about matters other than
the issue of defendant's insanity. If that were allowed,
a defendant would be justified in refusing to provide
full disclosure to the examiner, fearful that incrimi-
nating information revealed would be used against
him at trial. If the statute is ignored, the protections it
affords are lost.

When, as here, a court allows an examiner to
impeach on an issue other than a defendant's mental
state, it violates the defendant's constitutional right to

---

[12] The statute defining the psychologist-patient privilege, in relevant
part, provides:

> A psychologist licensed or allowed to use that title under this
> part or an individual under his or her supervision cannot be com-
> pelled to disclose confidential information acquired from an indi-
> vidual consulting the psychologist in his or her professional capac-
> ity if the information is necessary to enable the psychologist to
> render services. Information may be disclosed with the consent of
> the individual consulting the psychologist, or if the individual con-
> sulting the psychologist is a minor, with the consent of the minor's
> guardian . . . . [MCL 333.18237; MSA 14.15(18237).]

"The privilege of confidentiality belongs to the patient; it can be waived
only by the patient." *Dorris v Detroit Osteopathic Hosp*, 460 Mich 26, 34;
594 NW2d 455 (1999).

> Privileged communications shall be disclosed upon request. . . .
> (e) If the privileged communication was made during an examina-
> tion ordered by a court, prior to which the patient was informed
> that a communication made would not be privileged, but only with
> respect to the particular purpose for which the examination was
> ordered. [MCL 330.1750(2); MSA 14.800(750)(2).]

due process of law.[13] To permit such testimony is to place the defendant between Scylla and Charybdis. The defendant must either forfeit his constitutional right to assert the insanity defense[14] or forfeit his constitutional right not to incriminate himself.[15] These alternatives are equally perilous.

In *Colorado v Connelly*,[16] the United States Supreme Court considered the confession of a mentally ill defendant who voluntarily admitted to having perpetrated a murder. It found that admission of the confession did not deny him due process, because there was no "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." *Id.* at 165. Connelly confessed without the state exerting any coercion or other action on him. *Id.* at 160, 165.

Here, by contrast, the state placed defendant in a coercive situation. The statute required him to fully cooperate with the examiner in a forensic interview in order to pursue his insanity defense. MCL 768.20a(2) and (4); MSA 28.1043(1)(2) and (4). Then, the court permitted the examiner to testify about matters other than defendant's mental state at the time the crime was committed.

> A plea of insanity is in the nature of confession and avoidance. By asserting it, defendant admits the charge but denies criminal culpability. But such admission extends only to the consideration of such plea; beyond that it has no

---

[13] US Const, Am XIV; Const 1963, art 1, § 17.

[14] US Const, Ams VI, XIV; Const 1963, art 1, §§ 13, 17, 20. "There is no question that a criminal defendant has a state and federal constitutional right to present a defense." *Hayes, supra* at 278.

[15] US Const, Am V; Const 1963, art 1, § 17.

[16] 479 US 157; 107 S Ct 515; 93 L Ed 2d 473 (1986).

efficacy in a criminal case. [2 Underhill, Criminal Evidence (5th ed, Supp 1970), § 450, p 370.]

The admission of defendant's involuntary confession violated his right to due process of law. "The aim of the requirement of due process is . . . to prevent fundamental unfairness in the use of evidence whether true or false." *Lisenba v California,* 314 US 219, 236; 62 S Ct 280; 86 L Ed 166 (1941). "[F]ailure to afford the petitioner a reasonable opportunity to defend himself against the charge . . . [is] a denial of due process of law." *In re Oliver, supra* at 273.

Restricting the use of statements made to a forensic examiner to those pertinent to a defendant's sanity is a measure to ensure a fair and reliable adjudication of the issue. The potential chill to a defendant's exercise of the right to present an insanity defense outweighs any potential gains to the truth-seeking process in discouraging or disclosing perjured testimony. *James v Illinois,* 493 US 307, 317; 110 S Ct 648; 107 L Ed 2d 676 (1990).

Thus, I disagree with the majority's opinion that the statutory preclusion of the forensic examiner's testimony involved only a privilege and that its violation was only an evidentiary error. This reasoning ignores the nature of the rights protected by the statute.

The situation was coercive in that defendant's statements were coaxed from him in an interview that was a prerequisite to his ability to raise the insanity defense. By dint of the statute, the government promised that the evidence produced would be admitted only for a limited purpose. To permit it to use defendant's incriminating statements breaks the promise and implicates the Fifth Amendment prohibition against

compelled self-incrimination.[17] See *People v Wyn-gaard*, 226 Mich App 681, 695; 575 NW2d 48 (1997) (MARKMAN, J., dissenting), *People v Reagan*, 395 Mich 306; 235 NW2d 581 (1975).

### III. CONSTITUTIONAL ERROR ANALYSIS

#### A. ISSUE PRESERVATION

"To preserve an evidentiary issue for appellate review, a party must object timely at trial and specify the same ground for objection as is asserted on appeal." *People v Considine*, 196 Mich App 160, 162; 492 NW2d 465 (1992). "[R]equiring a contemporaneous objection provides the trial court an opportunity to correct the error, which could thereby obviate the necessity of further legal proceedings and would be by far the best time to address a defendant's constitutional and nonconstitutional rights." *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999) (internal quotation marks omitted).

In this case, defense counsel objected to the testimony of the forensic examiner on the ground that the communication was privileged. The testimony was in fact privileged and inadmissable. MCL 768.20a(5); MSA 28.1043(1)(5); *People v Jacobs*, 138 Mich App 273, 276-278; 360 NW2d 593 (1984). That defense counsel did not name the pertinent statute when voicing the objection did not render it lacking in adequate specificity to preserve the issue. The trial court was

---

[17] Contrary to the assertion of the majority, I am not advancing the position "that every trial error effectively presents a constitutional violation." *Ante* at 296. The error in admitting the forensic examiner's testimony in violation of the statute implicates constitutional rights far more directly and offensively than many other trial errors.

sufficiently put on notice of the grounds for objection
to prevent the error by precluding the testimony.

## B. APPLICABLE STANDARD OF REVIEW

> An error that violates the federal constitution obliges us
> to look to federal precedent for the harmless error rule. The
> United States Supreme Court has set forth a two-part
> inquiry. First, a court must ask if the error is a structural
> defect in the constitution of the trial mechanism, which
> defies analysis by harmless-error standards. . . .
>
> At the other end of the spectrum . . . are trial errors
> that occur during the presentation of the case to the jury,
> and which may therefore be quantitatively assessed in the
> context of other evidence presented in order to determine
> whether its admission was harmless beyond a reasonable
> doubt. This requires the beneficiary of the error to prove,
> and the court to determine, beyond a reasonable doubt that
> there is no reasonable possibility that the evidence com-
> plained of might have contributed to the conviction. [*People
> v Anderson (After Remand)*, 446 Mich 392, 404-406; 521
> NW2d 538 (1994) (internal quotations marks, brackets and
> citations omitted); see also *Arizona v Fulminante*, 499 US
> 279, 307-309; 111 S Ct 1246; 113 L Ed 2d 302 (1991); *Chap-
> man v California*, 386 US 18, 23-24; 87 S Ct 824; 17 L Ed 2d
> 705 (1967).]

In this case, the error in admitting the testimony of
the forensic psychologist was preserved, nonstruc-
tural constitutional error. The prosecution bears the
heavy burden of showing that the admission of the
forensic examiner's testimony was harmless beyond a
reasonable doubt.

> [T]he Court has been faithful to the belief that the harm-
> less-error doctrine is essential to preserve the "principle
> that the central purpose of a criminal trial is to decide the
> factual question of the defendant's guilt or innocence, and

promotes public respect for the criminal process by focus-
ing on the underlying fairness of the trial rather than on the
virtually inevitable presence of immaterial error." [*Fulmi-
nante, supra* at 308 (citation omitted).]

[W]hether . . . the error was harmless beyond a reasona-
ble doubt . . . in a particular case depends upon a host of
factors, all readily accessible to reviewing courts. These
factors include the importance of the witness' testimony in
the prosecution's case, whether the testimony was cumula-
tive, the presence or absence of evidence corroborating or
contradicting the testimony of the witness on material
points, . . . and, of course, the overall strength of the pros-
ecution's case. [*Delaware v Van Arsdall*, 475 US 673, 684;
106 S Ct 1431; 89 L Ed 2d 674 (1986).]

### C. APPLICATION OF THE HARMLESS ERROR DOCTRINE

The error in this case was an egregious denial of
the defendant's fundamental right to due process of
law. Despite the majority's claim that the overwhelm-
ing weight of the evidence was in the prosecution's
favor, I would hold that it nonetheless failed to carry
the burden required by *Anderson, supra*. There is a
distinct, reasonable possibility that the evidence com-
plained of might have contributed to the conviction.

That defendant promised to visit Margo DeVita
daily to persuade her to leave his house and that that
explains his frequent presence at her apartment does
not defy common sense. Defendant is essentially
alleging that Margo was obsessive and dependent on
him for money and would not leave without assur-
ances of his continued presence and her continued
financial security.

Margo testified that someone kicked open her front
door from outside. Yet, the only damage to the front
door is consistent with someone inside trying to get
out.

The majority makes much of defendant's testimony that he heard "Cherry" say "John kill Steve," an inaccurate statement to the extent that Steve remained alive for hours after being wounded. However, the statement's inaccuracy does not discredit defendant's testimony. According to defendant, Cherry witnessed Steve being shot in the face and bleeding profusely. In such a circumstance, any witness might exclaim that the person had been killed.

The majority is skeptical of defendant's testimony that he struggled with men near Margo's house, broke away, got into his car parked next door at John's house, and drove off. However, according to defendant, Margo had told him that John had his car, correcting her earlier story. Defendant likely knew that John lived next door to Margo, and so it is quite plausible that he would find his car there and use it to effect his escape.

Finally, the majority finds unbelievable defendant's testimony that he engaged in routine behavior after escaping, rather than calling the police. But, defendant easily could have avoided calling the authorities out of fear of repercussions from the real killers because of shock or mental imbalance or because he distrusted the police.

I refute the majority's interpretation of defendant's unsolicited statement: "They count five. They say I killed five people. I only kill one. Why do they count five now?" This does not necessarily amount to admission of the crime. The statement could be interpreted in an innocuous manner, especially given defendant's poor command of the English language. The outburst could have been an expression of his incredulity that he could be charged with three

counts of murder and two counts of assault with intent to commit murder when only one man died.[18]

A forensic examiner is a professional, likely a coherent and persuasive witness. For such a witness to testify that a defendant, in interviews before trial, contradicted his testimony in front of the jury would be greatly destructive of the defendant's credibility.[19] This is particularly true here, because defendant was deprived of effective assistance of counsel, his theory of the case having been presented in a vague and confusing manner.

Allowing the forensic examiner's testimony more likely than not resulted in the jury largely disbelieving defendant's testimony. As the jury was, in essence, presented only with the prosecutor's proofs, it is inevitable that the evidence of defendant's guilt would seem overwhelming. Even so, the jury did not convict defendant on the two counts of assault with intent to murder and the felony-firearm counts supported by those assaults. See *supra* note 4. If the evidence of guilt was truly overwhelming, it is curious that the jury failed to convict on all charged counts.

---

[18] The majority argues "[a] brick is not a wall, and the credibility of defendant's story cannot be measured by viewing its elements in isolation." *Ante* at 301, n 14. Yet the majority also views each element of the defendant's story in isolation and concludes that it is implausible or that the prosecutor's version is more plausible. It then piles "pro-guilt" inference upon pro-guilt inference until, together, they constitute "the entire panoply." The majority's analysis is equally subject to the criticism it aims at this dissent.

[19] The majority asserts that little additional prejudice resulted from the jury learning that, in his forensic interview, defendant claimed he was never at Margo DeVita's house the day of the killing. *Ante* at 300. I disagree. As already discussed, defendant's testimony about his "postkilling conduct" was not necessarily prejudicial to him. In any event, the impeachment testimony directly implicating defendant in a lie was far more damaging.

It was defendant's testimony alone that rebutted the prosecution's case. On the basis of the jury's two and a half days of deliberation, one could reason that the jury was reluctant to convict. Therefore, it is questionable whether the error in admitting the forensic examiner's testimony could have been harmless beyond a reasonable doubt.

Criminal defendants have a constitutional right to raise a defense. US Const, Ams VI, XIV; Const 1963, art 1, §§ 13, 17, 20. Yet, access to the defense of insanity is chilled if, in asserting it, defendants expose themselves to impeachment for every inconsistency between their trial testimony and their forensic interviews. The Court of Appeals correctly reversed defendant's convictions on this ground.

IV. CONCLUSION

Unlike the majority, I find that defendant is entitled to a reversal of his convictions, because he was deprived of effective assistance of counsel. The majority errs in finding that the trial court's admission of the forensic examiner's testimony to impeach the defendant was not constitutional error. Furthermore, the trial court's error was not harmless beyond a reasonable doubt. To allow defendant's convictions to stand makes a mockery of the law's concern for a fair trial and damages public respect for the judicial process. I would affirm the holding of the Court of Appeals.

CAVANAGH, J., concurred with KELLY, J.

YOUNG, J., took no part in the decision of this case.