# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

GIANDRE ROOSEVELT BURNS,

Defendant-Appellant.

UNPUBLISHED
September 24, 2015

No. 321570
Wayne Circuit Court
LC No. 13-000751-FC

Before: GADOLA, P.J., and JANSEN and BECKERING, JJ.

PER CURIAM.

Defendant, Giandre Burns, appeals as of right his jury trial convictions of assault with intent to do great bodily harm less than murder, MCL 750.84, felon in possession of a firearm, MCL 750.224f, carrying a concealed weapon, MCL 750.227, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant, as a second habitual offender, MCL 769.10, to 5 to 15 years' imprisonment for his assault with intent to do great bodily harm less than murder conviction, 5 to 7-1/2 years' imprisonment for his felon in possession and carrying a concealed weapon convictions, and two years' imprisonment for his felony-firearm conviction. We affirm defendant's convictions, but remand for resentencing.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise from the shooting of Shatara Ayers. At the time of the shooting, defendant was dating Leslie Johnson, Shatara's sister. On or about January 5, 2013, defendant and Johnson drove to Shatara's house to pick up their children, who had been babysat by Shatara and other family members. When Johnson went to the door to pick up the children, Shatara asked her for a hug; Johnson declined. Johnson then waited outside until the children were ready. A few moments later, the children emerged, along with Shatara, her son, Damien Jones, as well as Darrius Robinson, Jones's cousin, and two of Jones's friends, DeJohn Hall and Jermaine Berry. Kevin Miller, Shatara's friend, stood in the doorway as the group approached defendant, who was sitting in his car. According to prosecution witnesses, the group carried bags containing clothes, bottles, and food for the children.

While various individuals were attempting to assist the children into the car, Shatara approached defendant at the front passenger side of the car and asked him "how long he was gone [sic] keep disrespecting [her] mother[?]" This question was in relation to an incident a few

-1-

weeks prior when defendant refused to give Shatara's mother, who walked with the assistance of a cane, a ride home from the hospital. According to Shatara, defendant used profanity and told her to get "away from my car," then pulled out a handgun and fired two shots with a .22-caliber revolver at her. One of the bullets struck Shatara in the arm, passing through her arm and into her torso. Defendant got out of the car and fired more shots, causing everyone to scatter.

Defendant testified on his own behalf. He admitted to firing shots, but contended that he did so in self-defense. He testified that he was sitting in his car at Shatara's house when suddenly he looked up and saw 10 "people running outside surrounding [his] car." He placed the handgun on his lap for "intimidation purposes" because he was afraid. According to defendant, Shatara walked up to the car and said "You're gonna have to use that" in reference to the gun. After Shatara leaned into the car, defendant told her to "get away from [his] car." Shatara leaned in, and, according to defendant, had her right hand behind her back. Defendant felt that Shatara was close enough to him that "if she had a weapon," he could have been "seriously injured." According to defendant, he fired one shot at Shatara inside the car and fired another after he stepped outside the vehicle.

A jury acquitted defendant of the more serious charge of assault with intent to commit murder and convicted him as noted above.

## II. JUDICIAL BIAS

Defendant first argues that the trial court "irreparably tainted" the jury by engaging in "repeated, excessive, and manifestly one-sided questioning of the primary witnesses in the case." In particular, defendant argues that the trial court's questioning of Johnson and of defendant crossed the line and demonstrated judicial bias.

## A. STANDARD OF REVIEW

When preserved, this issue presents a question of constitutional law that we review de novo. *People v Stevens*, __ Mich __; __ NW2d __ (Docket No. 149380, issued July 23, 2015), slip op at 5. However, where, as here, defendant failed to object to any of the alleged instances of judicial misconduct, our review is for plain error affecting substantial rights. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011).

## B. THE VEIL OF JUDICIAL IMPARTIALITY

The record reveals that after the prosecutor and defense counsel finished questioning witnesses, the trial court questioned nearly all of the witnesses in this case—both prosecution and defense witnesses. A trial judge has broad, but not unlimited, discretion when controlling the proceedings, and can question witnesses. MRE 614(b); *People v Taylor*, 252 Mich App 519, 522; 652 NW2d 526 (2002). The overriding principle is that a judge's actions are not to pierce the veil of judicial impartiality. *People v Davis*, 216 Mich App 47, 50; 549 NW2d 1 (1996).

In *Stevens*, __ Mich at __, slip op at 8, our Supreme Court recently clarified the inquiry a reviewing court is to undertake in determining whether a judge's conduct pierces the veil of impartiality. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the

judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id.* The requisite inquiry is fact-specific and considers the cumulative effect of any alleged errors, "within the context of a given case." *Id.* at 9.

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. [*Id.*]

## 1. THE NATURE OF THE JUDICIAL CONDUCT

"As an initial matter" explained the Court in *Stevens*, we are required to look at the nature or type of judicial conduct at issue. *Id.* at 10. This provides "the starting point to evaluate whether the conduct overstepped the line of judicial impartiality." *Id.* At this starting point, we acknowledge that the conduct at issue in this case, questioning witnesses, is generally permissible under MRE 614(b). *Id.* To this end, "it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *Id.* at 11. Yet, a judge's ability to question witnesses is not without limitations. *Id.* See also *Taylor*, 252 Mich App at 522. For instance, it "is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally." *Stevens*, __ Mich at __, slip op at 11.

In *Stevens*, the trial court judge engaged in "repeated questioning" of the defendant's expert witness, including targeting the doctor's qualifications, questioning his medical conclusions, and questioning the doctor's motivation for testifying on defendant's behalf. *Id.* at 18-21. The trial judge's use of the word "allegedly" when questioning the expert—and the fact that the judge did not use that word when questioning any other witnesses' testimony or conclusions—demonstrated the judge's disbelief of the testimony. *Id.* at 22-23. Overall, reasoned our Supreme Court, given the trial court's repeated questioning, which did not clarify any information but essentially amounted to a spirited cross-examination of the defendant's expert witness, the judge's conduct "weigh[ed] in favor of finding it reasonably likely that the judge improperly influenced the jury by creating the appearance of advocacy or partiality against defendant." *Id.* at 21.

## 2. THE TONE AND DEMEANOR OF THE TRIAL JUDGE

The next step in reviewing the challenged conduct requires us to "consider the tone and demeanor the trial judge displayed in front of the jury." *Id.* at 12. "It will often be the case that analysis under this factor will dovetail with analysis of the nature and type of judicial conduct; the manner in which the judge's inquiry is made will affect how the jury perceives the conduct." *Id.* at 24. If the judge's opinions about the case are plainly exhibited to the jury through tone and demeanor, the judge can deprive the defendant of a fair trial. *Id.* at 12. Thus, "[t]o ensure an appearance of impartiality, a judge should not only be mindful of the substance of his or her words, but also the manner in which they are said." *Id.* When a judge undertakes to question witnesses, he or she "should avoid questions that are intimidating, argumentative, or skeptical."

*Id.* In *Stevens*, the trial court's tone and demeanor, along with the sequence of questioning, "projected incredulity, bias, and hostility" towards defendant. *Id.* at 23.

When engaging in this step of the inquiry, a reviewing court is to be mindful that the tone and demeanor of a trial judge's comments can be difficult to gauge from a transcript. *Id.* at 13. "However, in certain circumstances, the very nature of the words used by the judge can exhibit hostility, bias, or incredulity." *Id.*[1]

### 3. THE SCOPE OF THE JUDICIAL CONDUCT

The third step of the inquiry articulated in *Stevens* requires us to consider the scope of the challenged judicial action within the context of the trial, including the length of the trial and the complexity, or lack thereof, of the issues presented. *Id.* For instance, where the issues are confusing, it may be appropriate for a judge to ask questions that clarify confusing testimony. *Id.* at 13-14.

### 4. AT WHICH SIDE THE JUDGE'S CONDUCT WAS DIRECTED

"Fourth, and in conjunction with the third factor, a reviewing court should consider the extent to which a judge's comments or questions were directed at one side more than the other." *Id.* at 14. Where it appears that a trial judge intervenes more on behalf of one side or the other, the intervention may demonstrate partiality. *Id.* For instance, where the judge's comments in *Stevens* were directed against defendant and served to undermine the defendant's expert witness, the imbalanced nature of the judge's questioning suggested partiality. *Id.* at 26-27. In particular, the judge in *Stevens* engaged in "aggressive" cross-examination of the defendant's expert witness. *Id.* at 26-27. The judge's questions also built upon one another in such a manner so as to build up the prosecution's case and to point out flaws in defendant's case. *Id.* In contrast, the judge did not subject any prosecution witnesses "to such hostile intervention." *Id.* at 27.

### 5. THE PRESENCE OF CURATIVE INSTRUCTIONS

"Lastly, the presence or absence of a curative instruction is a factor in determining whether a court displayed the appearance of advocacy or partiality." *Id.* at 14. Jurors are presumed to follow their instructions, and "[d]epending on the circumstances, an immediate curative instruction may further alleviate any appearance of advocacy or partiality by the judge." *Id.* However, when a judge's conduct is so far beyond what is proper and strongly suggests partiality, a curative instruction may not be enough to undo the damage done. *Id.* at 15. In *Stevens*, the Court concluded that although the presence of a "general curative instruction" weighed against finding that the judge's comments pierced the veil of impartiality, "the totality-of-the-circumstances test requires that this factor be considered alongside the others" and the instruction was not enough to cure the damage done by the judge's conduct in that case. *Id.* at 27.

---

[1] Although defendant did not raise any objections in this case, an objection can be useful to note the inappropriate tenor of a judge's comments. *Stevens*, ___ Mich at ___, slip op at 13.

## C. APPLICATION

### 1. NATURE OF THE JUDICIAL CONDUCT

#### *a.* QUESTIONS POSED TO JOHNSON

The first inquiry in this case draws our attention to the nature of the judicial intervention. Defendant first notes that the trial court engaged in an extensive examination of Johnson after the prosecutor and defense counsel finished questioning her. The record reveals that the judge began his examination by clarifying some basic information about Johnson and Shatara and their familial relationship. The judge's questioning then took a somewhat upsetting turn, focusing on a matter that had previously been undisputed—that defendant had a previous felony conviction and thus was prohibited from possessing a firearm at the time of the shooting:

*Q.* Did you know that [defendant] had a gun in his car [on the day of the shooting?]

*A.* No.

*Q.* You never saw that gun before?

*A.* I mean, I knew [he] had a gun. But I didn't know it was in the car.

*Q.* You knew he had a gun?

*A.* Yes.

*Q.* But you knew he had been convicted of a felony before too, didn't you?

*A.* Yes.

*Q.* Yeah. And you knew that he shouldn't have a gun then, right?

*A.* Yes.

*Q.* Oh, but that was okay with you?

*A.* No.

*Q.* So did you tell him, you shouldn't be having a gun in this car?

*A.* I didn't know it was in the car?

*Q.* Oh, you didn't know it was in the car?

*A.* No.

This line of questioning gives us cause for concern. The judge's questions did not clarify any complicated issues or resolve any matters that were unclear from previous testimony. At the time the judge asked the questions, it was undisputed that defendant had a gun and was ineligible to possess that weapon, given his previous felony conviction. Whether his possession of that gun was "okay with" Johnson or whether she told him "you shouldn't be having a gun in this car" was not something that was in issue, and had little relevance to the case. We agree with defendant that this line of questioning could have had the appearance of being adversarial in its nature.

Thereafter, the judge continued questioning Johnson, this time bringing up questions about why she had not hugged Shatara when she went to the door. Earlier, Johnson testified she did not hug Shatara because she was in a hurry. The trial court questioned her about this as follows:

> *Q*. And where you in such a hurry to go to [sic] that you couldn't give your sister a hug that afternoon?

> *A*. I just had to go home. I was just in a rush to get home. I just been movin' that day. And I was tired.

> *Q*. Whoa. And that prevented you from giving your sister a hug?

> *A*. Yep.

> *Q*. How long do you think it would take someone to give a hug to somebody else? A long time, right?

> *A*. No.

> *Q*. How long?

> *A*. A quick second.

> *Q*. Oh, okay.

While not rising to the level of the inappropriate conduct in *Stevens*, we agree that this type of questioning was unwarranted. Indeed, although the judge did not question Johnson's motivation for testifying or challenging the accuracy of her testimony as did the trial judge in *Stevens*, __ Mich at __, slip op at 18-20, we nevertheless find that the judge's questions approached and may have even crossed the line of what was and was not appropriate. The judge essentially cross-examined Johnson about a minor point in her testimony and, with apparent sarcasm, questioned how she could be so busy she would not stop to give her sister a hug, something that would likely take only a "quick second."

Thereafter, the judge delved into Johnson's testimony that Shatara and other individuals "surrounded" defendant's car when they brought out the children. The judge began by asking whether Johnson saw any weapons, such as bricks, guns, knives, or baseball bats in the hands of

-6-

the individuals who approached the car; Johnson answered in the negative to each question. The trial court continued:

> *Q*. But then you said, that they came out and they surrounded the car. What did you mean by the term surrounded? That reminds me of the Indians you know, surrounding a wagon wheel, a stage coach or something out in the old west, okay. Were these people surrounding this car and pounding on the car[?] Were they doing that?
>
> *A*. No.
>
> *Q*. Were they hitting up the car with bricks or something like that?
>
> *A*. No.
>
> *Q*. Were they shooting at the car?
>
> *A*. No.
>
> *Q*. Were they spitting at the car?
>
> *A*. No.
>
> *Q*. Were they even talking?
>
> *A*. I'm not sure.
>
> *Q*. Why did you use the term surrounded?
>
> *A*. Because everybody was around the car.
>
> *Q*. Oh, around the car?
>
> *A*. Yes.

Again, this type of questioning certainly looks like cross-examination. A cross-examination, we might add, that, in certain instances, can be described as boorish with regard to its mention of "Indians" surrounding a stagecoach. Yet, we note that the question about how defendant's car was "surrounded" gave some insight into Johnson's use of the term and served to clarify some of her earlier testimony. Still, while not rising to the level of overt hostility or disbelief that was present in the trial judge's questioning in *Stevens*, __ Mich at __, slip op at 20-23, the questioning nevertheless gives us pause.

The judge continued his inquiry into Johnson's testimony, eliciting testimony that she did not see all of the events that unfolded because she was strapping one of her children into a car seat. He also asked her if she was fearful after the shooting, asking her why she drove off instead of making sure her family members were safe, cutting her off when she attempted to explain *why* she drove off with defendant, explaining "I didn't ask you why . . . ." In addition, the judge asked how she knew defendant was scared, posing the following question: "And before

-7-

the shooting erupted, you said, well, the defendant was scared. Mr. Burns was scared 'cause the car was surrounded. And these people rushed out of the house. Well, how was he scared? Was he, his eyes were bulging out of his head[?] Was he saying, oh, I'm scared. What was he saying?"

While we are not as concerned with these inquiries as is defendant, we question the relevance of some of the questions. Again, not all of the questioning appeared to elicit information on contested issues. Also, the questions pertaining to whether Johnson was able to see some of the events clearly because she was strapping a child into a car seat sound more like cross-examination than a balanced inquiry into the facts.

In sum, as it pertains to Johnson, we are concerned that the extent and nature of the questioning could be viewed as indicating a disbelief of Johnson. Although it may not have been the trial court's intent to do so, the length of the questioning and the nature of some of the questions asked tended to reflect a somewhat negative view of Johnson—who, we might add, was one of defendant's key witnesses. Indeed, the trial court appeared to respond to some of Johnson's testimony with sarcasm and he engaged her in cross-examination in several aspects, including aspects of her testimony that were only marginally probative. This factor weighs in favor of finding it was reasonably likely that the judge improperly influenced the jury by creating the appearance of partiality against defendant. See *id.* at 21.

Yet, we note that the nature of the questioning in this case was not as indicative of partiality as was the questioning in *Stevens*. In that case, the judge's questions served to undermine defendant's expert witness in a number of ways; this was significant because expert testimony was critical to the issue of the defendant's guilt or innocence in that case. See *id.* at 18-23. In addition, the judge overtly injected his opinion about the expert's testimony by questioning the expert with the phrase "you would agree with me . . . ." *Id.* at 18. Here, by contrast, while some of the judge's comments could be construed as indicative of a disbelief of some of Johnson's testimony, such as her assertion that she was too tired to give her sister a hug, the disbelief was more benign in nature, and not directed at issues that were critical to defendant's guilt or innocence. The questions in this case suggested less of a disbelief of defendant's case as they did a level of aggravation with Johnson. This fact distinguishes the instant matter from a case defendant cites, *People v Redfern*, 71 Mich App 452, 456-457; 248 NW2d 582 (1976), where the trial judge questioned the defendant in a way that undermined the defendant's only defense and called into question the defendant's credibility in regard to that defense. Essentially, in *Redfern*, a case that involved prosecution for the defendant's receipt of money, the trial judge asked questions that contained facts that directly contradicted the defendant's innocent explanation for having the money—that he won it at a racetrack—by stating in one of the questions that the racetrack was not open at the time defendant claimed to have received the money. *Id.* This type of questioning not only showed bias but it significantly harmed defendant's only defense. Here, while the judge's questioning of Johnson is troubling, it was not nearly as pointed or damaging as the questioning in *Redfern*.

### b. QUESTIONS POSED TO DEFENDANT

We note that Johnson was far from the only witness the trial judge questioned. As defendant notes, the judge also questioned him after defense counsel passed on re-direct

examination. The judge asked defendant about such matters as to whether "a 22[-]caliber bullet [can] kill somebody," the amount of pressure it took to pull the trigger on his gun, whether defendant had to continue pulling the trigger in order to fire more shots, and whether the gun kicked after he fired it. We do not believe that these questions were of the same ilk as those posed to Johnson. The questions pertained to defendant's intent and were not indicative of any disbelief that the trial court might have harbored in regard to defendant's testimony. Nor was the judge argumentative when he questioned defendant. On the whole, the judge's questions were directed at defendant's knowledge and about his actions when he began shooting. These questions were relevant to the question of self-defense, and the judge was permitted to engage in this type of inquiry with defendant. See *Davis*, 216 Mich App at 51-52 (explaining that a judge was permitted to question the defendant about matters that were relevant to his theory of self-defense).

## 2. TONE AND DEMEANOR

Our analysis into the judge's tone and demeanor ties in with our analysis of the nature of the judge's interventions. As stated above, some of the judge's questions in this case are concerning, particularly the sarcastic nature in which he posed some of the questions to Johnson. Nevertheless, Johnson was not the only witness whom the trial court engaged in sarcastic and sometimes colorful questioning. As will be discussed in more detail below, the trial court questioned nearly all of the prosecution's witnesses in this case. For instance, when questioning Shatara, the judge asked her about whether she had been angry when she walked out to defendant's car, asking if she acted with a "huff and a puff and anger" when she approached defendant before the shooting began. In addition, while another prosecution witness, Dominique Ayers, was testifying, the judge told her to speak louder. The judge continued "I mean, if you want them [the jury] to hear you [speak up.] If you don't want them to hear you[,] whisper." This could be viewed as an assessment by the judge that, if Ayers had testimony she wanted the jury to hear, i.e., testimony that was harmful to defendant, who was accused of shooting at her aunt, Shatara, she should speak louder. Given that the judge treated both defense and prosecution witnesses with sarcasm at times, we do not find that this factor weighs in favor of finding it was reasonably likely that the judge created the appearance of partiality against defendant. Cf. *Stevens*, __ Mich at __, slip op at 24 (finding partiality in the trial court's demeanor when the court used the words "alleged" and "allegedly" when questioning a defense witness but did not use such words when questioning any other witnesses). In addition, while evaluating this factor, as did the Court in *Stevens*, we acknowledge that a judge's tone and demeanor can be difficult to ascertain from a transcript, particularly where, as was the case here, defendant did not object to the trial court's conduct. See *id.* at 13. Given these difficulties, we decline to read too much into the trial court's tone and demeanor. In addition, we note that the trial judge appeared to treat all witnesses equally and did not overtly express a tone of disbelief toward them. While some of the judge's questions, particularly some of his questions posed to Johnson, were a bit colorful and unorthodox, there was not anything particularly troubling, from

our review of the transcript, about the judge's tone or demeanor.[2] This again distinguishes the judge's conduct from the conduct at issue in *Stevens*. Cf. *id.* at 22 (finding partiality in the judge's tone and demeanor when, in that case, the judge dismissed the testimony of the defendant's expert by remarking "that's just your opinion.").

In evaluating tone and demeanor, we are aware that defendant highlights some of the judge's questioning of Johnson in which he responded to Johnson's answers with "Oh, I see." Defendant's argument suggests that these comments were indicative of disbelief of Johnson's testimony. However, the record reveals that the judge responded to both prosecution and defense witnesses with "Oh, I see" and "I see" after they answered questions. Consequently, we do not see on the record before us that the trial court's tone or demeanor was particularly indicative of bias or partiality toward either side. Cf. *id.* at 24 (finding partiality in the trial court's demeanor when the court used the words "alleged" and "allegedly" when questioning defendant but did not use such words when questioning any other witnesses).

### 3. SCOPE OF THE CONDUCT IN LIGHT OF THE COMPLEXITY OF TRIAL

This was not a particularly complex trial. However, our review of the record reveals that neither the prosecutor nor defense counsel engaged in extensive questioning of the witnesses. This led to, in several instances, the trial judge eliciting pertinent information when he questioned witnesses, thereby explaining, in part, the judge's decision to question nearly every witness in this case. We also note that defendant presented a self-defense theory at trial, which required him to produce evidence that "he honestly and reasonably believe[d] that he [was] in imminent danger of death or great bodily harm and that it [was] necessary for him to exercise deadly force." *People v Riddle*, 467 Mich 116, 119; 649 NW2d 30 (2002). The trial judge was thereafter required to determine if defendant met his burden, and if he had, the judge was required to instruct the jury on self-defense. See *People v Rodriguez*, 463 Mich 466, 472; 620 NW2d 13 (2000). See also *Davis*, 216 Mich App at 51-52. Many of the trial court's questions in this case were directed toward what defendant believed, such as his questioning of Johnson in regard to whether defendant appeared afraid. Also, while we do not agree with the manner in which the judge phrased his questions to Johnson about whether the car was indeed "surrounded," such questions could have had some relevance in regard to whether defendant believed his life was in danger.

### 4. DIRECTION OF THE JUDGE'S CONDUCT

Although defendant contends that the trial judge directed his comments and questions in a manner that undermined the defense, our review of the record does not support defendant's assertion. While we question the need for such extensive questioning as occurred in this case, we find that the overall effect of the trial judge's questions and comments were, when considered in their entirety, rather neutral. The judge repeatedly questioned multiple witnesses, engaging

---

[2] In this regard, we note the lack of an objection from defense counsel at trial. Perhaps if a record had been made of some of the comments, defendant could have a more compelling argument. In the absence of such an objection, we will not speculate about tone or demeanor.

prosecution and defense witnesses in what essentially appeared to be cross-examination. For instance, Jones, a prosecution witness, volunteered an answer about what he perceived as Shatara's intent in approaching defendant's car in response to a question posed by jurors about where her body was positioned relative to defendant's car. After sustaining an objection from defense counsel that the answer was based on speculation, the trial judge jumped in and, in essence, cross-examined Jones on his answer:

> THE COURT. The objection is sustained. How can you tell us what she was intending to do, if you haven't spoken to her since this incident happened?

> [Jones]. I know my mother. She's an adult. She not 'bout to try to fight no young man. He ain't –

* * *

Later, when questioning Robinson, another prosecution witness, about why he and his friends were carrying items to defendant's car along with the children, the judge appeared to question Robinson's motivations, asking whether he was "just trying to be helpful?" when he went out to defendant's car.

In addition, the judge undertook a fairly lengthy examination of two law enforcement officers in this case—officers who testified on behalf of the prosecution—with many of the questions taking on the appearance of cross-examination. Notably, the judge engaged Shannon Wright, a police officer, in a fairly extensive examination about firearms, most of which was not pertinent to any matter at issue in this case. The judge also asked whether a larger-caliber bullet would travel a shorter distance than a smaller-caliber bullet, asking "You don't know that?" when Wright testified she was unsure about which bullet would travel a greater distance. The manner in which the judge asked the question could imply some disbelief that Wright would not know as much.

Similar to the manner in which the judge questioned Wright, the judge asked Sergeant Todd Eby, a prosecution witness to whom virtually no questions were posed by either party, about whether the police ever searched defendant's home. He also asked whether the officers recovered defendant's car. Eby answered in the negative to each inquiry. Eby made no mention of any searches before the judge's questioning. In effect, the judge's questions to Eby served to highlight things the police did not do, thereby, at least to some extent, serving to undermine the police investigation into this matter. In this respect, the judge's questioning of Eby in this manner could be viewed as helpful to defendant's cause.

In sum, while the judge pressed Johnson on several matters and toed the line of improper questions, he also asked the several prosecution witnesses questions that could have suggested a disbelief of their respective testimony. Notably, the judge questioned why Wright would not know certain information, and asked questions to Eby about the thoroughness, or lack thereof, of the police investigation. He also appeared to express disbelief with regard to Jones's volunteered

-11-

answer about what Shatara intended to do when she approached defendant's car.[3]  Thus, on this record, the judge at times stepped into the role of both the prosecutor and defense counsel in some of his questions to witnesses.  While we do not necessarily condone[4] the extent of the meddling in this case, we nevertheless do not believe that, when reviewing the entirety of the judicial interventions in this case, the court's comments and questions had the effect of favoring one side or the other.  Rather, the judge took equal opportunity to press both parties' witnesses on certain matters.

In this regard, the instant case stands in significant contrast to the judge's intervention in *Stevens*.  In that case, the judge asked questions of the prosecution's witnesses in a manner that built upon his previous questions and "often appeared to be designed to further weaken defendant's case."  *Stevens*, __ Mich at __, slip op at 26.  The judge also questioned the prosecution's expert by having the witness reiterate that he was a "head medical examiner"; this type of questioning appeared to work in tandem with the judge's questioning of the defendant's expert witness, which focused on the fact that defendant's expert was an assistant medical examiner, thereby implying that the prosecution's expert was more qualified.  *Id.* at 26-27.  And, in that case, the judge only subjected defendant's witnesses to a "hostile intervention" and did not subject the prosecution's witnesses to such questioning.  "In other words," explained the Court, "not only was judicial questioning imbalanced in number but also in style."  *Id.* at 27.  Here, by contrast, the record does not reveal imbalanced intervention by the trial judge.

## 5.  CURATIVE INSTRUCTIONS

Unlike in *Stevens*, we find that the presence of curative instructions was enough to alleviate the harm, if any, caused by the judge's improper conduct in this case.  Here, the judge gave a general instruction that his comments, questions, and statements were not evidence, and that if the jury "believe[d] that [he] had an opinion about how [it] should decide this case, [it] must pay no attention to that opinion," and it was to decide the case solely on the evidence presented.  Jurors are presumed to follow their instructions.  *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011).  Although we are troubled by some of the judge's comments, particularly some of his questions posed to Johnson, we do not find, based on the totality of the circumstances, that the nature of the judicial intervention in this case was so problematic that it could not be alleviated by jury instructions.  Cf. *Stevens*, __ Mich at __, slip op at 27.

---

[3] We also note that the judge expressed considerable angst at the prosecutor when she attempted to show a photograph to the jury without admitting the photograph and for using a projector-type device to show the photograph.  For instance, the court asked the prosecutor "What [the] heck is going on here?" and admonished her to "[t]urn that thing off" before excusing the jury and further chastising the prosecutor.

[4] In this regard, we would caution against such extensive questioning by trial judges as occurred in this case.  As this Court explained in *People v Roby*, 145 Mich App 138, 144; 377 NW2d 366 (1985), "[w]hen the court engages in extensive interrogation of witnesses, the probability of asking questions improper in form or scope increases; yet, the attorneys are almost certainly more reluctant to object to the court's improper questions than to an adversary's."

Accordingly, we decline to find plain error affecting substantial rights, and reject defendant's claim that judicial bias entitled him to a new trial.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts that he was denied the effective assistance of counsel when his trial counsel failed to question Shatara regarding her alcohol consumption on the day of the shooting and for counsel's failure to "point out to the jury" during closing arguments that Shatara had a blood alcohol-level that was slightly over the legal limit for driving an automobile. We disagree.

When a defendant does not move for a *Ginther*[5] hearing or a new trial in the trial court on the basis of ineffective assistance of counsel, appellate review is limited to mistakes apparent on the record. *People v Rodgers*, 248 Mich App 702, 713-714; 645 NW2d 294 (2001). Defendant did not move for a *Ginther* hearing or a new trial in the trial court on the basis of ineffective assistance of counsel. Therefore, appellate review of this issue is limited to mistakes apparent on the record. *Id.* Whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). A trial court's findings of fact, if any, are reviewed for clear error, and questions of constitutional law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

The United States and Michigan Constitutions guarantee a defendant the right to the effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20; *Trakhtenberg*, 493 Mich at 51. To establish ineffective assistance of counsel, the defendant must show that "(1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant." *People v Heft*, 299 Mich App 69, 80-81; 829 NW2d 266 (2012). A defendant is prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different. *Id.* at 81. "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012), quoting *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). A defendant must overcome the strong presumption that counsel's performance constituted sound trial strategy. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). Decisions regarding what evidence to present, what evidence to highlight during closing argument, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). This Court will not "second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).

Defendant contends that counsel was ineffective for failing to question Shatara regarding her alcohol consumption on the day of the incident. However, decisions regarding how to question a witness are presumed to be matters of trial strategy. *Horn*, 279 Mich App at 39.

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Here, counsel questioned Shatara in a manner that focused on whether her interactions with defendant would have given rise to a reasonable belief of imminent harm to defendant. Whether Shatara's blood-alcohol content was above the limit for driving an automobile and whether this influenced her behavior had little to do with whether it was reasonable for defendant to believe that he was in imminent harm. Indeed, it was the reasonableness of defendant's belief, not what could have influenced Shatara's behavior, that was relevant. Furthermore, we note that evidence concerning Shatara's blood-alcohol content was before the jury; her medical records, which specifically identified her blood-alcohol level, were admitted into evidence. Therefore, defendant cannot overcome the strong presumption that counsel's performance constituted sound trial strategy. *Toma*, 462 Mich at 302.

We also reject defendant's contention that trial counsel was ineffective for failing to highlight during closing arguments that Shatara's medical records indicate that her blood alcohol content was slightly above the legal limit for driving an automobile. Where the evidence of Shatara's blood-alcohol content was, at best, marginally relevant, we will not fault trial counsel for focusing on evidence that was more relevant to defendant's claim of self-defense and the perceived weaknesses in the prosecution's case. And, again, we note that evidence of Shatara's blood-alcohol content was before the jury already. Thus, even to the extent counsel's actions could be perceived as objectively unreasonable, defendant would be unable to demonstrate the requisite level of prejudice. See *Heft*, 299 Mich App at 81.

## IV. SENTENCING

Lastly, defendant argues that he is entitled to resentencing as a result of the trial court's erroneous assessment of offense variable (OV) 4 and OV 12. We agree.

The trial court's factual determinations under the sentencing guidelines are reviewed for clear error and must be supported by the preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

Initially, as to OV 12, the prosecution concedes error, and we agree that the trial court erred by scoring the offense variable at 5 points. The offense variable should not have been scored because any "contemporaneous felonious criminal acts" committed by defendant resulted in separate convictions in this case. See MCL 777.42(2)(a)(*ii*).

We also find that the facts in this case did not support a score of 10 points under OV 4. OV 4 is psychological injury to a victim. MCL 777.34(1). OV 4 is properly assessed zero points when no serious psychological injury requiring professional treatment occurred to a victim. MCL 777.34(1)(b). OV 4 should be assessed 10 points if serious psychological injury requiring professional treatment occurred to a victim. MCL 777.34(1)(a). In making this determination, the fact that treatment has not been sought is not conclusive. MCL 777.34(2). "The trial court may assess 10 points for OV 4 if the victim suffers, among other possible psychological effects, personality changes, anger, fright, or feelings of being hurt, unsafe, or violated." *People v Armstrong*, 305 Mich App 230, 247; 851 NW2d 856 (2014), citing *People v Gibbs*, 299 Mich App 473, 493; 830 NW2d 821 (2013). However, there must be actual record evidence

supporting a finding that the victim suffered psychological injury, and "[t]he trial court may not simply assume that someone in the victim's position would have suffered psychological harm because MCL 777.34 requires that serious psychological injury "*occurred* to a victim." *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012).

Here, there was no evidence of any kind that would satisfy a score of 10 points under OV 4. Although Shatara testified at trial, she never expressed any fear or any type of emotion that could satisfy OV 4. Nor was there a victim's impact statement detailing any type of emotional reaction. While it seems likely that Shatara would have been afraid and that she suffered some type of serious psychological injury, the record is completely void of such evidence, and we are left to speculate as to whether a serious psychological injury occurred. Such speculation is not appropriate. *People v McChester*, __ Mich App __; __ NW2d __ (Docket No. 318145, issued May 5, 2015) (finding the trial court erred by scoring OV 4 at 10 points when, although there was evidence that the victim of an unarmed robbery in which the defendant feigned holding a gun was "visibly shaken," "the record [was] essentially barren on the issue [of serious psychological injury] and speculation cannot form the basis to affirm a 10-point score for OV 4."). See also *Lockett*, 295 Mich App at 183.

After subtracting the erroneously scored points from defendant's OV level, his guidelines range changes, requiring resentencing. See *People v Thompson*, __ Mich App __; __ NW2d __ (Docket No. 318128, issued August 25, 2015), slip op at 8.

Affirmed in part and remanded for resentencing. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Kathleen Jansen
/s/ Jane M. Beckering