*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DONALD WAYNE DAVIS, JR.,

        Defendant-Appellant.

FOR PUBLICATION
April 2, 2020
9:00 a.m.

No. 343432
Genesee Circuit Court
LC No. 16-040020-FC

Before: SWARTZLE, P.J., and MARKEY and REDFORD, JJ.

MARKEY, J.

Defendant appeals by right his convictions of first-degree felony murder, MCL 750.316(1)(b), first-degree premeditated murder, MCL 750.316(1)(a), four counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, assault with intent to rob while armed, MCL 750.89, felon in possession of a firearm, MCL 750.224f, and felon in possession of ammunition, MCL 750.224f(6). Defendant was sentenced as a third-offense habitual offender, MCL 769.11, to life imprisonment without the possibility of parole for the first-degree murder conviction (alternate theories), two years' imprisonment for each of the felony-firearm convictions, 25 to 50 years' imprisonment for the assault conviction, and 5 to 10 years' imprisonment for each of the felon-in-possession convictions. On appeal, defendant contends that he was denied his constitutional right to a public trial and that the trial court erred by admitting into evidence an e-mail defendant sent to a detective. Because we conclude the trial court did not close the courtroom to the public the second day of trial and because we find the admission of the e-mail did not constitute reversible error, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

On April 27, 2016, a security officer working at an apartment complex saw a running car parked outside the complex. When the security officer approached the parked car, he saw the victim, Devante Hanson, sitting in the driver's seat. The security officer could see that Hanson had blood on his chest and called 911. When police officers arrived, Hanson was pronounced dead, and it was determined that Hanson had suffered gunshot wounds.

Video surveillance from the apartment complex showed two men, purportedly Spencer Holiday and defendant, entering Hanson's car. Holiday sat in the front passenger seat and defendant sat in the back passenger seat behind the driver's seat, which was occupied by Hanson. Hanson then exited the car, went to the trunk of the vehicle, and then returned to the driver's seat. The video footage showed that there was a lot of movement in the car, and then both Holiday and defendant left the vehicle and went back into the apartment complex. They proceeded through the lobby and subsequently entered another nearby apartment complex.

Holiday, who accepted a plea offer in exchange for his testimony against defendant, stated that on the date of the homicide, Holiday was with defendant in defendant's apartment when defendant told Holiday that he was looking for someone to rob. When Holiday left the apartment to buy marijuana and cigarettes, defendant accompanied Holiday. Holiday told defendant that Hanson was going to meet them and sell them some marijuana.

Holiday testified that when Hanson arrived, defendant and Holiday climbed into Hanson's car. Defendant, sitting in the backseat, pulled out a gun and demanded money and marijuana from Hanson. According to Holiday, Hanson grabbed defendant's gun, and defendant shot Hanson. After defendant shot Hanson, he pointed his gun at Holiday and told him to shoot Hanson or else defendant would shoot Holiday. Holiday acknowledged that he then shot Hanson in the ribs.

On February 21, 2018, the first day of trial, jury voir dire was conducted, a jury was selected, and the trial court gave the jurors their preliminary instructions. On February 22nd, opening statements were made and the prosecution presented three witnesses before a break for lunch. After the last morning witness was called, but before the court recessed for the lunch hour, the following colloquy between the trial court and counsel took place:

*The Court*: Go ahead deputies. Yeah, just stay there please.

*Mr. Sawka* [prosecutor]: I just want to let the Court know for the record, there were–

*Mr. White* [defense counsel]: Yeah, I want to make sure that's–

*Mr. Sawka*: –family members in the hallway, but there was no contact with the jury from what–as they passed by. I don't want there to be any issues.

*The Court*: That's why I wanted everybody to wait.

*Mr. Sawka*: Oh, yeah. They were–

*Unidentified speaker*: They were outside the door.

*Mr. Sawka*: They were already outside, that was the problem, so sorry.

*(At 11:46 a.m., court recessed)*

During the break, a woman, who identified herself as Daundria Frye and the mother of Hanson's child, made contact with a member of the jury. When court reconvened, the following is reflected in the trial transcript:

*(At 1:58 p.m., court reconvened)*

*Mr. Ellis* [court clerk]: All rise.

*The Court*: Okay. Thank you. Are we ready, Mr. Sawka?

*Mr. Sawka*: Yes, Your Honor.

*The Court*: Then we'll bring the jury in and you all can sit down until the jury enters the room please. Well no, we're not ready. We are not ready. Who is in the gallery that works at Hurley Hospital? Nobody in the gallery. You maybe? Do you work there or not?

*Unidentified speaker*: Pardon me, sir?

*Ms. Frye*: I work there.

*The Court*: Sit down. I want you to come up and stand at that lectern right there please.

*Ms. Frye*: Right there?

*The Court*: Yes. I want you to come up here and stand where that microphone is.

*Ms. Frye*: Okay.

*The Court*: What is your name?

*Ms. Frye*: Daundria Frye.

*The Court*: Say it again?

*Ms. Frye*: Daundria Frye.

*The Court*: Frye?

*Ms. Frye*: Uh-hum.

*The Court*: Spell it for me.

*Ms. Frye*: Um, D-A-U-N-D-R-I-A. Frye, F-R-Y-E.

*The Court*: Where do you work at Hurley Hospital?

*Ms. Frye*: Housekeeping. Environmental Services.

*The Court*: And you are here watching this trial why?

*Ms. Frye*: Why am I watching it?

*The Court*: Yes.

*Ms. Frye*: Because Devante Hanson was my kid's father.

*The Court*: So you know, counselors, the jury has complained that that woman has tried to talk to them.

*Ms. Frye*: No. I didn't try to talk, I just saw a lady and I asked—I'm like did you—do you work at Hurley's? I know I'm not supposed to talk to them.

*The Court*: I've got two choices. One is to find you in contempt of court and lock you up.

*Ms. Frye*: [Are] you serious?

*The Court*: I'm serious. The other is to order everyone in the gallery to leave the courthouse and not come back. What we're going to do is this; in order to lock you up I'd have to get you a lawyer first and that wastes time because we have things to do here. So instead, I'm going to bar everyone from this courthouse except for [Hanson's] mother . . . . The rest of you leave. Don't you come back.

*Ms. Frye*: Okay.

*The Court*: Shame on you trying to subvert the justice system.

*The Deputy*: Just have them hold until somebody (inaudible). Your Honor, we're gonna have a deputy escort them out.

*The Court*: That's a good idea.

*The Deputy*: We're gonna get a deputy to escort you out.

*Unidentified Speaker*: Judge, you did mean for the remainder of the trial correct?

*The Court*: For the remainder of the trial, all the way into next week.

*Unidentified Speaker*: All right.

*The Court*: The only person allowed to watch this trial is the mother of the young man who died. What foolishness.

*Mr. White*: Your Honor, may we approach?

*The Court*: Yes. Do you want this on the record or off the record?

*Mr. Sawka*: It probably should be on because I think it's for both of our benefit here.

*The Court*: Okay.

*Mr. Sawka*: Do you want to have the jurors who have a complaint to come in to double check to make sure that there has been no comment that has been made that's gonna prejudice the–anything?

*The Court*: No.

*Mr. Sawka*: Okay. Fair enough.

*The Court*: No. It was a short comment. What she asked one juror was, do you work at Hurley Hospital.

*Mr. Sawka*: Okay. So, there's nothing about the case itself that was implicated?

*The Court*: Right.

*Mr. White*: Well it's still enough to sit there to cause some concerns, but I guess you worked it out. I understand why the concern (inaudible).

*The Court*: Sure.

*Mr. Sawka*: It's up to you. Do you want him – are you okay with it?

*Mr. White*: (inaudible) with the Judge's decision.

*Mr. Sawka*: I don't have a need for a hearing if that's all that was said.

*The Court*: I don't think it's necessary.

*Mr. Sawka*: Okay. Thank you.

*The Court*: I don't want to make the jury nervous. Now we'll bring the jury out.

*Court Clerk*: All rise for the jury.

The jury then heard from two witnesses on the afternoon of February 22, 2018. On February 27th and 28th, during two full days of trial, the jury heard from 11 prosecution witnesses and one defense witness. On March 1st, closing arguments were presented; the jury was given final instructions, and verdicts were returned. Except for Hanson's mother, there is no indication any other spectators attended the trial, from the afternoon on the second day of trial until the verdicts were returned.

Defendant was convicted as indicated and filed his claim of appeal. Defendant subsequently filed a motion for remand, requesting the case be remanded for an evidentiary hearing and to allow defendant the opportunity to file a motion for new trial on a variety of issues. This

Court granted the motion in part, remanding the case to the trial court "to expand the factual record regarding its decision to close the trial to all members of the public except for the victim's mother, and to allow defendant to file a motion for new trial based on his claim that trial counsel was ineffective for failing to object to the court's decision." *People v Davis*, unpublished order of the Court of Appeals, entered November 13, 2018 (Docket No. 343432).

The record reflects that on February 21, 2016, the first day of trial, the court was in session from 9:41 a.m. until 12:45 p.m., and from 2:21 p.m. until 3:04 p.m. On February 22, 2016, the second day of trial, the court was in session from 9:19 a.m. until 11:46 a.m., and from 1:58 p.m. until 3:14 p.m.

An evidentiary hearing was conducted on remand, and the trial court denied defendant's motion for new trial. Defendant's sister testified at the evidentiary hearing that she came to the courthouse during the trial and found the courtroom door locked, but she was unsure whether it was during a lunch break or other type of break. She came back the next day but then left after feeling threatened by the victim's family.

There was also testimony by Bryan Wooten, a man who had dated defendant's mother for about nine years. He stated that he came to the courthouse to attend the trial and was able to freely enter the courtroom without any difficulty. The courtroom door was not locked. No sign was posted excluding any person or persons. When he entered, a deputy was present. The deputy took no action whatsoever to exclude, remove, or otherwise deny access to Wooten. Once in the courtroom, however, defendant gestured for him to leave and he left the premises. Only defendant acted in a way to convince Wooten to leave the courtroom.

The court cleared the courtroom of the individuals the court felt were disruptive, all of whom were apparently there on behalf of the victim. Those individuals did not return to the courtroom for the remainder of the trial. There is, however, no evidence to suggest that the court was closed. On remand, the trial court specifically stated:

> The Court emptied the courtroom because there was a conversation that occurred between one of the victim's family and the jury, and I didn't want that to happen by either side so I ordered the courtroom emptied. But I did not lock the courtroom, I did not close it to the public, I just kicked out three to ten people. And I admit I poorly worded it because I said don't come back and I probably should've said don't come back today. That's my error. However, there was no one from the defendant's side to evict from the courtroom and the Court doesn't see any prejudice to him if his family were not present during the proceedings.

> I agree with Ms. Jurva that Ms. James' testimony is not relevant, nor is Mr. Wooten's. And so, the motion for a new trial is denied and the record is made for the Court of Appeals. Thank you.

At the evidentiary hearing, defendant's trial counsel testified. He was asked why he did not object to the trial court's decision to close the courtroom. Counsel explained that when the court made its decision *none* of the spectators or members of the public who were present in the courtroom were there to support defendant—no family, friends, or acquaintances. Instead,

according to counsel, the three to ten individuals in the gallery were the victim's friends and family and were there to support the prosecution's case against defendant. Counsel indicated that it was preferable and less prejudicial to defendant to solely have the victim's mother present. Counsel testified as follows:

> *Q*. So did you think it was actually better to only have the victim's mother here as opposed to having a large group of people?
>
> *A*. Absolutely.

The trial court stated that it had removed everyone from the courtroom because there was a conversation between a juror and Frye. At the completion of the hearing on remand, the trial court ruled:

> [I] did not lock the courtroom, I did not close it to the public, I just kicked out three to ten people. And I admit I poorly worded it because I said don't come back and I probably should've said don't come back today. That's my error. However, there was no one from the defendant's side to evict from the courtroom and the [c]ourt doesn't see any prejudice to him if his family were not present during the proceedings.

## II. ANALYSIS

On appeal, defendant argues that the trial court closed the courtroom to all members of the public except for the victim's grieving mother and that this resulted in an inherently unfair trial that requires defendant to receive a new trial. Defendant further contends that trial counsel was ineffective for failing to object to the trial court's decision to close the courtroom. Finally, defendant maintains that the trial court erred in allowing the admission of an e-mail that defendant sent to a detective while defendant was incarcerated. Defendant also claims that trial counsel was ineffective for failing to challenge the admission of the e-mail under MRE 403.

## A. STANDARDS OF REVIEW

Defendant did not object to the trial court's actions, which he argues resulted in the closure of the courtroom. In *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), our Supreme Court set forth the plain-error test generally applicable to forfeited error:

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial

-7-

proceedings' independent of the defendant's innocence. [Quotation marks, citations, and alteration omitted.]

Whether counsel was ineffective presents a mixed question of fact and constitutional law, and factual findings are reviewed for clear error while we review de novo issues of constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). "When the decision regarding the admission of evidence involves a preliminary question of law, such as whether a statute or rule of evidence precludes admissibility of the evidence, the issue is reviewed de novo." *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003).

## B. THE COURTROOM

The Sixth Amendment to the United Stated Constitution provides that a criminal defendant "shall enjoy the right to a . . . public trial . . . ." "The Sixth Amendment right to a public trial is incorporated to the states by the Due Process Clause of the Fourteenth Amendment." *People v Vaughn*, 491 Mich 642, 650; 821 NW2d 288 (2012). In addition, article 1, § 20 of the Michigan Constitution guarantees that "the accused shall have the right to a speedy and public trial . . . ." "A defendant's Sixth Amendment right to a public trial is limited, and there are circumstances that allow the closure of a courtroom during any stage of a criminal proceeding, even over a defendant's objection[.]" *Vaughn*, 491 Mich at 653.

## 1. THE COURTROOM IN THIS MATTER WAS NOT CLOSED

We conclude based on a review of the entire record, both at trial and on remand, that the courtroom in this case was not closed. The record reflects that the trial judge *cleared* the courtroom of persons then present in the courtroom because Frye, the mother Hanson's child, had intentionally sought to have improper contact with the jury. Following the court's colloquy with Ms. Frye, as set forth above, the court ordered the persons then present in the courtroom with the exception of the victim's mother, to leave the courtroom and to not return.

## 2. ASSUMING ARGUENDO THE COURTROOM WAS CLOSED—ON THE FACTS AT BAR—REVERSAL IS NOT APPROPRIATE

The Court in *Vaughn* noted that the constitutional right to a public trial is structural in nature. *Id.* at 655. Nevertheless, the *Vaughn* Court held "that a defendant's right to a public trial is subject to the forfeiture rule articulated in . . . *Carines*[.]" *Id.* at 646. The *Vaughn* Court continued, stating:

Thus, the failure to assert a constitutional right ordinarily constitutes a forfeiture of that right. In analyzing a forfeited claim of error, a defendant is not entitled to relief unless he can establish (1) that the error occurred, (2) that the error was "plain," (3) that the error affected substantial rights, and (4) that the error either

-8-

resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id*. at 654.

The Court rejected the proposition that the right to a public trial can be waived by remaining silent when a closure of the courtroom is ordered. *Vaughn*, 491 Mich at 661-664. Here, the facts differ as have been ascertained during the evidentiary hearing: defense counsel intentionally voiced no opposition to the trial court's clearing the courtroom because he thought it inured to defendant's benefit. Hence, we conclude that defendant purposely waived the right to a public trial in light of trial counsel's testimony at the evidentiary hearing following remand, if, indeed, the courtroom was actually closed, a fact not established in view of the testimony of the witnesses at the evidentiary hearing. Counsel strategically and intentionally relinquished or abandoned the right to a public trial in order to vastly reduce the number of supporters for the victim in the courtroom in an effort to mask the fact that no one was there for defendant. Trial counsel, however, did not *affirmatively* indicate an approval of the court's decision, so we will review the matter under the plain-error test in order to avoid any conflict with *Vaughn.*

We first hold that if the trial court had in fact closed the courtroom for almost the entire trial, it would have been plain error.[1] The trial court certainly had an overriding interest in preventing the jury from being tampered with or tainted through improper contact initiated by an individual with close ties to the victim. See *People v Wood*, 326 Mich App 561, 578; 928 NW2d 267 (2018) ("when it comes to the prevention of jury tampering, it has long been held that states may punish or regulate speech *intended to interfere* with court proceedings or with the right of an accused to have his case decided by an impartial jury"). But in closing the courtroom to all spectators for the vast majority of the trial,[2] the trial court would have implemented a mechanism to protect against jury tampering that was, under the circumstances, much broader than necessary to protect the valid interest in having and maintaining a fair and impartial jury. There were reasonable alternatives to closing the courtroom to all interested observers for the remainder of the trial following the incident involving Frye. The trial court could have held Frye in contempt, could have solely barred Frye from the courtroom for the day or duration of the trial, or, perhaps, the court could have closed the courtroom to all spectators, but only for the afternoon proceedings on February 22, 2018. The trial court's action in closing the courtroom for the entirety of the trial was not supported by adequate findings and reflected a bit of an overreaction to Frye's conduct. Moreover, we are operating under the assumption that Frye was acting with some nefarious intent by asking the juror about her employer instead of simply making an innocent mistake. If the trial

---

[1] The trial court stated that it did not actually close the courtroom to the public and that the doors were never locked, nor was anyone ever ejected from the courtroom after Frye's ejection. We decline to call into question the highly-respected jurist's credibility, so we shall proceed with our analysis on the *assumption* that the courtroom was closed for the remainder of the trial. We also note that the victim's mother had a statutory right to be present during the trial. See MCL 780.761 and MCL 780.752(1)(m)(*ii*)(C).

[2] For ease of reference, we shall not continually note that the victim's mother was permitted to be in the courtroom.

court closed the courtroom, it was error and the error was clear and obvious, i.e., it constituted *plain* error. *Carines*, 460 Mich at 763.

The next question under the plain-error test is whether the plain error affected defendant's substantial rights or, stated otherwise, whether the plain error prejudiced defendant. *Id.* With respect to this third prong of the plain-error test in the context of a constitutional violation of the right to a public trial, the *Vaughn* Court stated:

> While the Supreme Court of the United States has specifically reserved judgment on whether an unpreserved structural error automatically affects a defendant's substantial rights, this Court[] . . . has explained that structural errors are intrinsically harmful, without regard to their effect on the outcome. Accordingly, our caselaw suggests that a plain structural error satisfies the third *Carines* prong.

> Nevertheless, even if defendant can show that the error satisfied the first three *Carines* requirements, we must exercise discretion and only grant defendant a new trial if the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. Although denial of the right to a public trial is a structural error, it is still subject to this requirement. While any error that is structural is likely to have *an* effect on the fairness, integrity or public reputation of judicial proceedings, the plain-error analysis requires us to consider whether an error *seriously* affected those factors. [*Vaughn*, 491 Mich at 666-667 (quotation marks, citations, alterations, and ellipses omitted).]

While our Supreme Court framed its discussion by stating that "our caselaw *suggests* that a plain structural error satisfies the third *Carines* prong[,]" we, as an intermediate appellate court, are not emboldened by this somewhat equivocal language to rule otherwise. (Emphasis added.) Accordingly, we hold that the trial court's plain error in closing the courtroom affected defendant's substantial rights as a matter of law, thereby satisfying the third prong of the *Carines* plain-error test.

The next step in the analysis requires us to exercise our discretion and ascertain whether the plain error resulted in the conviction of an actually innocent defendant or, in the alternative, whether the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of defendant's innocence. We first conclude that the plain error in closing the courtroom did not result in the conviction of an actually innocent defendant. Rather, the prosecution presented evidence from which reasonable jurors could find defendant guilty beyond a reasonable doubt, and closing the courtroom likely had no impact on the jury's verdict. Accordingly, we must assess whether closing the courtroom seriously affected the fairness, integrity, or public reputation of the judicial proceedings. In *Vaughn*, 491 Mich at 667, the Supreme Court observed:

> The United States Court of Appeals for the Second Circuit has recognized that it does not follow that every temporary instance of unjustified exclusion of the public—no matter how brief or trivial, and no matter how inconsequential the

proceedings that occurred during an unjustified closure—would require that a conviction be overturned. While the Second Circuit's analysis does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer prejudice or specific injury, it examines whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment. The goals sought by these protections include (1) ensuring a fair trial, (2) reminding the prosecution and court of their responsibility to the accused and the importance of their functions, (3) encouraging witnesses to come forward, and (4) discouraging perjury. [Citations omitted.]

Here, we are not addressing a situation involving a temporary, brief, or trivial instance of unjustified exclusion of the public, nor was the public barred solely during inconsequential portions of the proceedings. Instead, the courtroom was closed to the public during the testimony of 14 witnesses spanning several days of trial, along with being closed during closing arguments and final instructions. *Vaughn* and the Second Circuit opinion discussed in *Vaughn* concerned the closing of the courtroom during jury selection and voir dire, with the *Vaughn* Court noting that the protected values of encouraging witnesses to come forward and discouraging perjury were not implicated because no witnesses testified. *Vaughn*, 491 Mich at 667-668. Again, in the instant case, 14 witnesses testified during the closure.

Despite these circumstances, we simply cannot find that the closure of the courtroom seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of defendant's innocence. We reach this conclusion because of the circumstances surrounding the closure of the courtroom and the testimony by trial counsel and others at the evidentiary hearing. The initial closure effectively cleared out spectators who supported the prosecution, reduced the perception that the gallery was pro-victim and against defendant, and it made less glaring the fact that no one was there who supported defendant. According to defendant's counsel at the remand hearing, this is exactly why counsel did not object to the closure of the courtroom—it was to defendant's benefit at the time. Furthermore, under these circumstances, we cannot conclude that trial counsel's performance in failing to object to the closure fell below an objective standard of reasonableness, considering that there was much logic to counsel's silence. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). Thus, counsel was not ineffective.

## C. ADMISSION OF DEFENDANT'S E-MAIL

The prosecutor introduced evidence of an e-mail that defendant sent to a detective while defendant was in jail. Before trial, the detective had approached defense counsel and asked counsel to see if defendant would be interested in sharing information with the police regarding another case in exchange for some possible assistance relative to the pending charges. Counsel conveyed the message to defendant, and then defendant sent an e-mail to the detective asking what kind of a deal he could receive in exchange for the information. The prosecutor filed a pretrial motion seeking an order allowing the admission of defendant's e-mail for purposes of show consciousness of guilt. The prosecutor argued that the e-mail did not violate MRE 410 regarding the inadmissibility of plea discussions and related statements because a police officer and not a prosecutor was involved in the communications. Defendant maintained that the e-mail was not

relevant, MRE 401 and 402. The trial court ruled that the e-mail was admissible, stating that it was up to the jury to interpret the e-mail's meaning. On appeal, defendant argues that the evidence was not relevant to consciousness of guilt, that the evidence was not admissible under MRE 403, and that trial counsel was ineffective for not raising an MRE 403 argument below.

We question the relevancy of the e-mail and whether it was probative of a consciousness of guilt, especially considering that no specific "deal" was ever offered or discussed. Also, we tend to believe that the evidence was problematic under MRE 403. Nevertheless, assuming error in the admission of the e-mail, we cannot conclude that the presumed error affected defendant's substantial rights, *Carines*, 460 Mich at 763, or that it "is more probable than not that a different outcome would have resulted without the error," *Lukity*, 460 Mich at 495. The evidence of defendant's guilt was substantial and the e-mail was of little probative value.

For the reasons stated above, we conclude that the courtroom was not closed by the trial judge. We further conclude that, under all of the facts and circumstances of this matter, if it were closed, reversal and remand for a new trial is not warranted for the reasons set forth above. Finally, regarding the introduction of the e-mail sent by defendant to the detectives, we conclude that it is not more probable than not that a different outcome would have resulted without the admission of the e-mail.

We affirm.

/s/ Jane E. Markey
/s/ James Robert Redford

-12-